DEACONESS MANOR ASSOCIATION, A Missouri Not For Profit Corporation, d/b/a Orchard House, Appellant,

v.

PUBLIC SERVICE COMMISSION OF THE STATE OF MISSOURI and Union Electric Company, Respondents.

No. WD 56075.

Missouri Court of Appeals, Western District.

June 22, 1999.

Paul H. Gardner, Jr., Jefferson City, for Appellant.

Carol M. Keith, Jefferson City, Colly J. Durley, Columbia, for respondent.

Before JOSEPH M. ELLIS, P.J., HAROLD L. LOWENSTEIN, Judge and VICTOR C. HOWARD, Judge.

ELLIS, Judge.

Deaconess Manor Association, d/b/a Orchard House (Orchard House) appeals from a judgment of the Circuit Court of Cole County affirming the decision of the Missouri Public Service Commission in favor of Union Electric Co. in a dispute regarding electric rates.

Orchard House is a retirement facility in Webster Groves, Missouri, owned by Deaconess Health Systems.[1] It began operation on August 7, 1989, and Union Electric Company began providing electrical service at that time. Orchard House consists of three interconnected buildings designated as Buildings A, B, and C. The project contains 171 living units plus public areas in Buildings A and B, with office and retail space in Building C.[2] Building A contains 92 apartments, plus a restaurant, while Building B contains 79 apartments. Each unit has electric cooking, laundry, heat and air conditioning facilities. Common areas consist of public laundry facilities, elevators, and parking garages.

Electrical power is supplied to the Orchard House project by way of one meter for the apartments and common area in Building A, one meter for the restaurant in Building A, one meter for the apartments in Building B, and separate individual meters for the businesses in Building C. The three buildings were supplied power by three separate transformers: Buildings A and B each had their own pad-mounted transformers, while Building C was connected to a pole-mounted transformer.

This dispute involves classification of Buildings A and B of Orchard House as a residential versus non-residential class customer for electrical service. The developer of Orchard House, Taylor–Morley–Simon, hired HPI Engineering as a consultant on the electrical systems. During construction of the facility, representatives

---

1. In the development stage, Orchard House was owned by a partnership of Taylor–Morley–Simon (45%), Deaconess Health Systems (45%), and SanDave, a corporation headed by David Sanders (10%). David Sanders was also one of the partners of Taylor–Morley–Simon, and an owner of HPI.

2. Service to Building C is not a disputed issue in this case.

of Union Electric, the utility supplier, met with HPI representatives and obtained load and electric metering information to estimate electrical demand at the site and determine the appropriate rate classification.[3] Union Electric has ten service classifications. Each classification is defined by a "rate application paragraph," which sets out the requirements for a customer to receive service based on that schedule. New customers are classified by way of three criteria: form of usage (residential or non-residential), desired service voltage (primary or secondary), and magnitude of load. Residential customers are differentiated from non-residential customers by load density, responsibility for secondary distribution systems, and line extension cost. In addition to the residential rate, there are four non-residential rate classifications: Small General Service, Large General Service, Small Primary Service, and Large Primary Service. Orchard House maintains that Union Electric improperly classified Buildings A and B as "residential," and that the proper classification should have been "Large General Service" (LGS).

The Missouri Code of State Regulations sets out the following requirements, effective December 15, 1980, for placement of electrical meters: "Each residential and commercial unit in a multiple-occupancy building construction of which has begun after June 1, 1981 shall have installed a separate electric meter for each residential or commercial unit." Mo.CODE REGS. ANN. tit. 4, § 240–20.050(2) (1996). A "residential unit" is defined as "one (1) or more rooms for the use of one (1) or more persons as a housekeeping unit with space for eating, living and sleeping, and permanent provisions for cooking and sanitation." Mo.CODE REGS. ANN. tit. 4, § 240–20.050(1)(G) (1996). A multiple occupancy building is "a building or premises which is designed to house more than one (1) residential or commercial unit." Mo.CODE REGS. ANN. tit. 4, § 240–20.050(1)(F) (1996). The rule carves out exceptions to the individual-metering requirement for transient and temporary facilities, adjacent commercial buildings, facilities where alternative renewable energy resources are used for centralized systems, and for that portion of electricity used for central space heating, hot water, ventilation and air conditioning. Mo.CODE REGS. ANN. tit. 4, § 240–20.050(4) (1996).

In 1987, representatives of Union Electric, along with individuals representing Orchard House's developers, held two or three pre-construction meetings to discuss the project's electrical needs.[4] Those present were Richard Kovach, manager of rate engineering at Union Electric, Joe Powell, customer service representative for Union Electric, Jerome Kovac, Jr., designer for HPI Engineering, and Gene Foshage, mechanical engineer with HPI. The purpose of the meetings was to determine Orchard House's particular needs and to address questions or concerns while the project was still on paper. Of those present at the meetings, only Richard Kovach and Jerome Kovac testified at the Commission hearing.

Richard Kovach of Union Electric testified that several options for electrical service were presented to the Orchard House representatives at the meetings. Jerome Kovac took the lead in clarifying the project's requirements, making it clear that the developers' primary concern was in minimizing up-front construction costs. Kovach (of Union Electric) testified that Kovac (of HPI) was not interested in the Large General Service rate because it would have required one transformer on

---

**3.** A rate classification is a grouping of customers by load and usage characteristics for the purpose of setting a rate, or tariff, for electrical service. Rate classifications are determined by the size of the load, rather than the type of structure using the electricity.

**4.** Orchard House was represented in these talks by HPI Engineering. HPI, partially owned by an owner of Orchard House, went out of business in late 1988.

the premises, with all cables from the three buildings running to that transformer. This would have increased initial costs, because it would have required longer cables. Additionally, the developers wanted to segregate the usage in Building A due to a sublease arrangement with the restaurant. It was Richard Kovach's testimony that Jerome Kovac stated Orchard House wanted four meters: two non-residential and two residential. He stated: "Jerry [Kovac] asked if there was going to be a problem with the residential Buildings A and B getting only one meter each...We told him which rates went with that form of service, and he said, 'That's what we want...And how do we get it?'" Kovach testified: "With the usage segregated between what was residential and what was non-residential, those three meters were billed on the only rates they qualified for." He went on to say that Kovac and Foshage accepted, without disagreement, the rate applicable to each meter.

Jerome Kovac testified that he could not recall if Union Electric offered the Large General Service option to HPI at the meetings, nor whether HPI was advised of the consequences of the metering arrangement. Since its dissolution, HPI's files cannot be located. Kovac stated that the decision on how electric service was to be delivered to the project was made by the developers, Taylor–Morley–Simon. However, Kovac testified that a single-meter option would not have been acceptable to the developers, given the increased construction cost. In the course of his work, Kovac would often calculate electric operating cost consequences, but was not sure if he did so for Orchard House. Based on his experience in calculating rates, he stated that, had Orchard House been individually-metered, he was "sure it would have been residential."

The cost of installing individual meters in each Orchard House apartment pursuant to 4 CSR 240–20.050(2) would have been $300 per unit to Orchard House and $220 per unit to Union Electric. Taylor–Morley–Simon did not want to incur the cost in excess of $50,000 to individually meter Buildings A and B, and urged Union Electric to obtain a variance to allow for mass metering.[5] Therefore, at Orchard House's request, and as a result of the meetings between the utility and HPI, Union Electric applied to the Public Service Commission (the Commission) in July, 1988 for a variance to install master meters. The application, entitled "Application of Union Electric for a Variance for the Orchard House Apartments" stated, in part:

> As ... electrical consumption consists of only basic cooking, lighting and small appliance use, estimated at approximately 270–300 kilowatthours at a cost of $19.00 to $23.00 per month, the Company believes the individual metering of such use would not be cost effective considering the small potential for conservation savings as compared with the costs to the developer ($300.00) and UE ($220.00) of individually metering each residential unit...The developer has marketed this project on the basis of carefree living, with all utilities (except telephone) included in a flat monthly operating fee in all project literature...Thus, a requirement for individual unit metering and billing within this project will simply result in increased initial and annual operating expense for both the Company and the developer without offsetting benefits attributable to conservation or other possible factors.

Following the application, the same individuals met with the Commission to discuss the variance, and were given an opportunity to raise questions and concerns. In making its recommendation to the Commission, the Variance Committee stated:

> The rule on Individual Electric Meters (4 CSR 240–20.050) allows master metering for this project except for master metering of the residential usage other

5. *See* Mo.Code Regs. Ann. tit. 4, § 240–20.050(5) (1996).

than central heating and air conditioning. The size of the apartments plus the provision of twenty meals per month and laundry facilities indicates that the lifestyle [sic] that would not necessitate high energy use. It is the opinion of the variance committee that potential conservation of energy by having individualized meters would not be significant to offset the cost of installing meters to each apartment.

The Commission found that, given the services provided to residents, such as meals and centralized conveniences, the potential energy conservation from individual metering would not be significant enough to offset the cost of installation, and granted the variance on September 2, 1988.

From 1989 to 1995, Union Electric billed Orchard House for electrical service to the apartments in Building A and all of Building B under its "Single–Metered Multiple–Occupancy Residential Building 1(M)" provision of the Residential Service rate classification.[6] The rate application paragraph for this classification states:

*Service Classification No. 1(M)*

*Residential Rate*

*1. Rate Application.* This rate is applicable to all normal residential service supplied directly by Company for:

\* \* \*

b. *Apartments.* A separately - metered individual flat or apartment unit used as the home, residence or sleeping place of one or more persons. Also, for buildings constructed before June 1, 1981, a multiple occupancy building of such units where service is delivered and metered at one point or one at which service is delivered at more than one point for valid engineering reasons. The billing provisions for single metered multiple oc-

cupancy residential buildings are as provided in paragraph 4.

\* \* \*

*4. Single–Metered Multiple–Occupancy Residential Buildings.* This paragraph applies only to buildings constructed and served under this provision prior to June 1, 1981. The total monthly bill to each such building to which service is delivered and metered at one point shall be equal to the total number of dwelling units therein multiplied by the bill per dwelling unit, which bill per dwelling unit shall be calculated by applying the Residential Service Rate to the average kilowatt hour use per dwelling unit (equal to the total building use divided by the number of dwelling units, rounded to the nearest kilowatt hour). Electrical use for common building services such as hall lights, elevators and laundry areas used exclusively by tenants may be metered and billed through the main building meter. Use for restaurants, arcade shops, retail stores, office space, or any other commercial venture must be separately metered and billed on the appropriate General Service or Primary Service Rate.

In October, 1995, based on revised tariffs approved by the Commission, Union Electric eliminated the Single–Metered Multiple–Occupancy Residential 1(M) rate provision and transferred all its customers receiving service under that rate, including Orchard House, to its Large General Service 3(M) rate provision.

On February 6, 1996, Orchard House filed a complaint with the Missouri Public Service Commission, alleging (1) that Union Electric had misclassified Buildings A and B as residential from 1989 to 1995 contrary to its rate schedule and in viola-

**6.** The restaurant in Building A was billed on the LGS service rate. Orchard House does not contest this billing.

tion of § 393.140(11),[7] and (2) that such misclassification resulted in overcharges and disparate treatment of Orchard House in comparison to other similar projects, in violation of § 393.130.[8] It alleged that, based on Paragraph 4 of Union Electric's rate classification, the Multiple–Occupancy Residential Service 1(M) classification only applies to buildings constructed before June 1, 1981, and no rate schedule was filed by Union Electric which would authorize it to bill Orchard House under this classification. The complaint sought recovery of the difference between the Multiple–Occupancy Residential rate and the less expensive Large General Service rate from August, 1989 to October, 1995.[9] Following an evidentiary hearing, the Commission dismissed Orchard House's complaint on August 19, 1997, finding that the variance for mass metering did not operate as a waiver of the residential rate classification. Following denial of its Application for Rehearing with the Commission on September 23, 1997, Orchard House filed an Application for Writ of Review in the Circuit Court of Cole County on October 21, 1997. Union Electric intervened as respondent. On June 1, 1998, the court entered its judgment affirming the Commission's order. This appeal followed.

On appeal, this court reviews the decision of the Commission, not the judgment of the trial court. *State ex rel. Office of Public Counsel v. Public Serv. Comm'n,* 938 S.W.2d 339, 341 (Mo.App. W.D.1997). We view the evidence in the light most favorable to the agency, together with all reasonable supporting inferences. *Friendship Village v. Public Serv. Comm'n,* 907 S.W.2d 339, 345 (Mo.App. W.D.1995). The Commission's order is presumed to be valid. *Id.* at 344. The challenger bears the burden of disproving its validity. *Id.*

Orchard House brings two points of error with numerous subpoints on appeal. In its first point, it argues that the Commission's report and order were unlawful and unreasonable, because Buildings A and B were not "apartments" as defined by the residential rate schedule, and therefore did not qualify for the residential rate. In the same point, it contends that the rate schedule excluded buildings constructed after June 1, 1981, and that Union Electric did not obtain an order of the Commission authorizing a waiver of the requirements of section 393.140(11). Union Electric maintains that in 1987, Orchard House's previous management representatives agreed to the rates initially assigned to each meter. Additionally, it argues that since the contested electrical usage in

---

7. All statutory references are to RSMo 1994 unless otherwise noted. Section 393.140(11) states, in pertinent part:

   Unless the commission otherwise orders, no change shall be made in any rate or charge, or in any form of contract or agreement, or any rule or regulation relating to any rate, charge or service, or in any general privilege or facility, which shall have been filed and published by a gas corporation, electrical corporation, water corporation, or sewer corporation in compliance with an order or decision of the commission, except after thirty days' notice to the commission and publication for thirty days as required by order of the commission, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the change will go into effect . . . No corporation shall charge, demand, collect or receive a greater or less or different compensation for any service rendered or to be rendered than the rates and charges

   applicable to such services as specified in its schedule filed and in effect at the time. . .

8. Section 393.130(3) states:

   No gas corporation, electrical corporation, water corporation or sewer corporation shall make or grant any undue or unreasonable preference or advantage to any person, corporation or locality, or to any particular description of service in any respect whatsoever, or subject any particular person, corporation or locality or any particular description of service to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

9. Orchard House's consultant, Bradley Brown, testified that he calculated the amount to be $148,573.13 for Building A and $91,671.10 for Building B, for a total of $240,244.23.

Buildings A and B was for residential dwelling purposes, it did not qualify for any other Union Electric rate for the period in question.

■ Our review of the Commission's order is a two-pronged test. *State ex rel. Utility Consumers Council, Inc. v. Public Serv. Comm'n*, 585 S.W.2d 41, 47 (Mo. banc 1979). The first step is to determine whether the Commission's order is lawful. *Id.* The lawfulness of the order turns on whether the Commission had statutory authority to act as it did. *State ex rel. City of St. Joseph v. Pub. Serv. Comm'n*, 713 S.W.2d 593, 595 (Mo.App. W.D.1986). On the issue of statutory authorization or lawfulness, we exercise independent judgment and do not defer to the Commission. *Friendship Village*, 907 S.W.2d at 348; *Utility Consumers Council*, 585 S.W.2d at 47.

Orchard House contends that since Buildings A and B were not *"separately metered,"* they do not qualify as apartments under paragraph 1b of Union Electric's rate application paragraph for Service Classification No. 1(M), Residential Rate. The alternative classification, "single-metered multiple-occupancy residential buildings" under paragraph 4, rules out any building *constructed after June 1, 1981,* since such buildings would have been required to be separately-metered under the provisions of § 240–20.050(2). Orchard House argues that its buildings, constructed in 1989 and mass-metered pursuant to the variance, do not meet either definition for Union Electric's 1(M) residential tariff.

■ The power of the Commission to make rules includes the power to determine any reasonable interpretation and application of such rules. *State ex rel. City of Springfield v. Public Serv. Comm'n*, 812 S.W.2d 827, 833 (Mo.App. W.D.1991). Here, the Commission determined that the Multiple–Occupancy Residential rate applied. In the context of that rate, the rate application paragraph refers to: "a multi-ple occupancy. building of such units [apartments] where service is delivered and metered at one point...." The first step in classifying Orchard House as a Multiple–Occupancy Residential buildings would have been to determine whether the units are "apartments."

■ The evidence clearly shows that, absent the variance obtained at Orchard House's request, the units meet the definition of "apartments." In its tenant lease, Orchard House refers to the residential units as "single-family private dwelling[s]." Tenants have their own keys to their units. Since 1994, Orchard House has been classified as "residential" for purposes of property taxation. A current representative of Orchard House testified to the Commission that all services provided by Orchard House could be obtained by an individual in a private home.

Bradley Brown, a utility consultant and expert witness for Orchard House, testified that, had the units been individually-metered as required by the rule prior to the variance, they would have qualified for Union Electric's residential rate. Additionally, Jerome Kovac of HPI testified: "[T]here are two primary classifications and residential...we knew they weren't going to have primary metering, and from an electrical construction standpoint, the rate that's applied other than primary, the equipment that's installed is irrelevant to the rate that is applied."

Furthermore, Orchard House did not take issue with numerous documents compiled during the variance process which characterized the units as residential. Paragraph 7 of the application states: "Union Electric's tariffs require the restaurant in Building A to be separately metered and billed to enable the remaining 93 residential units in Building A to *qualify for Residential Rate's billing*." (emphasis added). The Variance Committee's recommendation stated: "The project consists of three buildings, A, B and C...Building A would have two meters, *one for residential service* and another for the

restaurant. Building B would have one meter *for residential service* and Building C would have one meter for commercial service." (emphasis added). For all of the reasons set out above, the Commission did not err in finding that the Orchard House units were "apartments."

█ Orchard House contends that, based on the residential rate definition, the Commission's order violates § 393.140(11). The section is lengthy and Orchard House does not direct this court to any specific portion which it believes may apply. The Commission's Findings of Fact, however, point to that portion of the statute which provides: "No corporation shall charge, demand, collect or receive a greater or less or different compensation for any service rendered or to be rendered than the rates and charges applicable to such services as specified in its schedule filed and in effect at the time...." Presumably, Orchard House contends that the Commission's order upholding Union Electric's charges from 1989 to 1995 violated the statute by allowing the company to collect a residential service fee contrary to its rate schedule which required the buildings to be "constructed and served prior to June 1, 1981," and should have obtained a waiver of its residential tariff provision.

█ As Orchard House points out, in order to bill contrary to its specified tariffs on file with the Commission, Union Electric is required by statute to make a written application to the Commission for approval of the change. The variance application by Union Electric made no mention of any waiver of any specified portion of its tariffs on file with the Commission. Union Electric did not request, nor did the Commission grant, any such waiver, and the variance for single metering of part of Building A and all of Building B did not operate to change any tariff application. Its stated purpose and effect was to allow a variance from the individual metering requirement *only*. No evidence was presented to suggest that Orchard House voiced a concern as to the billing rate. Its

objective was to avoid the high start-up cost of individually metering all 170 apartments. It requested that Union Electric obtain the variance to circumvent the requirements of 240–20.050 and allow for mass metering. Even so, the meters were broken out by type of usage, so that all apartments in each building were metered separately from the commercial usage. This arrangement reflects Orchard House's understanding that such usage differences were significant.

The metering requirements of 240–20.050(2) do not address or impact rate applicability or classification. The variance application made no mention of rate, only of the impact of the *metering* requirements. Orchard House's own expert, Brown, testified that: "A variance obtained from the individual metering rule pursuant to 4 CSR 240–20.050(5) is *only* a variance from the individual metering requirement of 4 CSR 240–20.050(2)." Brown testified before the Commission that "[t]he variance had no relevance to the rate." Brown stated that Union Electric should have obtained a variance or waiver from the requirements of the Residential Service Rate tariff. This statement reflects the heart of the dispute. Union Electric did not seek a variance of the tariff, only of a metering requirement. Therefore, all other restrictions and classifications remained in place, including the applicable tariffs. While Brown testified that "residential usage" does not dictate rate classification, the tariff's rate application paragraphs indicate precisely the opposite.

Regardless of whether the variance had been granted, Orchard House's apartment units would have met the statutory definition of "residential unit." Regardless of how the electrical usage was metered, such usage remained for residential dwelling purposes, and Union Electric's residential rate is the appropriate rate for that usage under either scenario. Therefore, we hold that the Commission, pursuant to its statutory authority, properly found that the

variance from the strictures of the statutory metering requirements did not operate as a waiver of the applicability of the Union Electric rate tariffs, and did not alter or preclude their applicability to the Orchard House project as compared to their application absent the variance. *See Friendship Village,* 907 S.W.2d at 349.

▮▮▮▮ The second step in our review of the lawfulness of the Commission's order is to determine whether the order was reasonable. *State ex rel. Utility Consumers Council, Inc. v. Public Serv. Comm'n,* 585 S.W.2d 41, 47 (Mo. banc 1979). An order is reasonable if it is supported by substantial and competent evidence on the whole record. *Friendship Village,* 907 S.W.2d at 344. "Substantial evidence" is competent evidence which, if true, has a probative force on the issues. *State ex rel. Utility Consumers Council of Missouri v. Public Serv. Comm'n,* 562 S.W.2d 688, 692 (Mo.App. E.D.1978). We will reverse the Commission's order only where it is clearly contrary to the overwhelming weight of the evidence. *Friendship Village,* 907 S.W.2d at 345. The Commission has broad discretion in evidentiary determinations. *Id.* If the Commission's decision is based on purely factual issues, we may not substitute our judgment for that of the Commission. *Office of the Pub. Counsel,* 938 S.W.2d at 342.

▮▮▮▮ The Commission's order states that of primary concern was whether Orchard House was given a choice in its billing rate application, given the hybrid nature of its operations. *See Friendship Village,* 907 S.W.2d at 345. It found that Orchard House failed to prove it was not given a choice. Where credible testimony is presented to support the Commission's findings, this court has found the Commission's order to be supported by competent and substantial evidence. *Friendship Village,* 907 S.W.2d at 349.

Two witnesses testified to their participation in the pre-construction meetings in 1987 regarding electrical usage for Orchard House: Richard Kovach of Union Electric and Jerry Kovac of HPI. Other witnesses who testified were not employed by Orchard House at the time and had no direct knowledge of the meetings or any resulting agreements. As the lead person from HPI dealing with Union Electric on the electrical system, Jerome Kovac represented the interests of Orchard House, per their own expert. Kovac testified that he could not recall whether Union Electric offered various rate options during the planning meetings, but the utility's rates were available to him and in his file. HPI would routinely do analysis of rate application to a facility if the owner requested. By contrast, Richard Kovach of Union Electric testified that such options were discussed and rejected. His file memoranda support these statements.

▮▮▮▮ "As long as the commission acts in accord with due process of law and its findings and decisions do not run afoul of constitutional and statutory requirements and the inherent powers of the courts, it is engaged in an exercise of the police power of the state, with which it is not the province of the courts to interfere." *Id.* (quoting *State ex rel. Chicago, Rock Island & Pac. R.R. Co. v. Public Serv. Comm'n,* 312 S.W.2d 791, 796 (Mo. banc 1958)). Since the Commission's order is not contrary to the overwhelming weight of the evidence, it is therefore reasonable. *State ex rel. Inter—City Beverage Co., Inc. v. Missouri Public Serv. Comm'n,* 972 S.W.2d 397, 401 (Mo.App. W.D.1998). Point I is denied.

▮▮▮▮ In its second point, Orchard House argues that the Commission's report and order was unlawful because it did not make findings of fact and conclusions of law on two issues, since those issues were presented to the Commission and it was statutorily required to rule on them. The issues are: (1) Union Electric's refusal to classify Orchard House on the Large General Service rate after it was requested in March, 1992; and (2) whether Orchard House should have been switched to the Large General Service rate after it was

requested in March, 1992. It cites to paragraphs 15, 16, and 36 of its complaint, as well as testimony presented at the hearing.

The Commission is required to make findings of fact and conclusions of law in a contested case. § 536.090. Whether such findings and conclusions are sufficient is an issue of law for the independent judgment of this court. *Friendship Village*, 907 S.W.2d at 345. Our first consideration is whether the issue was properly before the Commission for a decision. *Id.*

Orchard House contends the issue was properly before the Commission, based on paragraphs 15, 16, and 36 of its Complaint, as well as testimony presented at the hearing. The paragraphs to which Orchard House cites in its complaint allege that it requested that Union Electric place Buildings A and B on the Large General Service rate "on several occasions after the inception of operations," that the requests were denied until 1995, and that such denial was unreasonable. None of the paragraphs reference a request of March, 1992. Orchard House also points to testimony by its expert and a former employee.

The issue is identical to that decided by this court in *Friendship Village*. In that case, the issue was whether appellants were given the option to choose the applicable electrical rate prior to construction of the project, and that the utility company refused to convert a portion of their service from the residential rate to the Large General Service rate. *Id.* at 345. Appellants in that case argued, *inter alia*, that the Commission should have made findings of fact in its order on the refusal issue, based on a combination of a liberal construction of the pleadings and testimony. *Id.* at 345–46. This court stated: "Appellants overlook the fact that the *complaint* must fairly present an issue for determination which falls within the jurisdiction of the Commission." *Id.* at 346 (emphasis in original). We therefore focus our inquiry on the complaint itself.

In *Friendship Village*, appellants argued that they had contacted the utility company concerning its rate classification in 1987, and the company had refused to reclassify them under the requested rate. *Friendship Village*, 907 S.W.2d at 346. This court found that where the complaint did not specifically reference a request in 1987, the denial of that request for reclassification was merely one aspect of the larger general issue of whether the utility company was charging complainants under the proper rate classification. *Id.* We stated: "Appellants' complaints were not sufficient enough to place the narrow issue of…denial of appellants' 1987 request for reclassification before the Commission in a manner requiring specific findings of fact and conclusions of law on the issue." *Id.* As the facts in the case at bar mirror those in *Friendship Village* on this issue, we find the Commission did not err in failing to make specific findings here. Point II is denied.

The order of the Public Service Commission is affirmed.

All concur.