Loren LONERGAN, Camielle Lonergan
and Michael Lonergan by Loren Loner-
gan, next friend, Appellants,

v.

Arthur B. and Carolyn N. MAY; Union
Electric Company; and David
Werner, Respondents.

No. WD 58498.

Missouri Court of Appeals,
Western District.

April 3, 2001.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 29, 2001.

Application for Transfer Denied
Aug. 21, 2001.

Randall D. Thompson, Kansas City, for appellant.

Carol Franke Walsh, Kansas City, for respondent May.

Ann Elizabeth Buckley, St. Louis, for respondent Union Electric.

Phillip Anthony Brooks, Kansas City, for respondent Werner.

Before HOLLIGER, P.J.,
LOWENSTEIN and NEWTON, JJ.

NEWTON, Judge.

## I. Factual and Procedural Background

On or about April 30, 1997, Michael Lonergan, David Werner and another passenger, not party to this suit, were riding in a 21 foot 1997 Regal boat on the Lake of the Ozarks (the lake) at approximately the 27.8 mile marker. Mr. Werner owned the boat. The boat collided with a catwalk connected to a boat dock, both owned by Arthur B. and Carolyn N. May (the Mays). The Mays also own lake property that is connected to the dock. As a result of the accident, the three passengers died.

Union Electric Company (UEC) operates a dam on Osage River to generate electricity at Bagnell Dam. UEC provides electricity for parts of Missouri and Illinois. It also owns the lake and acquired the shoreline lands, lands underlying the reservoir, and owns the majority of the shoreline property around the lake.

The United States Army Corps of Engineers delegated UEC the authority to is-

sue boat dock permits. Federal Energy Regulatory Commission (FERC) transferred its authority to permit boat docks at the lake to UEC in its licensing agreement. The boat dock permits issued free of charge by UEC cannot be transferred from the permittee to a subsequent owner without prior written notice to UEC and without the subsequent owner's signature indicating that he has complied with all the terms and conditions of the boat dock permit. The Mays did not obtain the requisite boat dock permit when they purchased the lake property, but the boat dock was already situated on the lake.

The Appellants filed a wrongful death petition against the Mays, Mr. Werner, and UEC for the death of Michael Lonergan. The petition alleged that Mr. Werner was negligent in the operation of the boat, the Mays were negligent for failing to light the dock or mark it with any reflective material and for not obtaining the boat dock permit, and that UEC failed to regulate obstructions to navigation on the lake. The Ad Litem for Mr. Werner reached an agreement with the Appellants and therefore is not a party to this appeal.

On January 7, 2000, the trial court granted the Mays' motion for summary judgment on the allegation that they were negligent for not obtaining a boat permit.[1] Then on January 19, 2000, UEC amended its answer and included §§ 537.345 through 537.348,[2] the Recreational Use Act (RUA or the Act), as an affirmative defense. Then the Mays amended their answer asserting the same affirmative defense.

UEC and the Mays filed a motion for summary judgment based on the immunity provisions in the RUA. The trial court sustained the respondents' motions for summary judgment. This appeal followed.

First, the appellants allege that the trial court erred in granting the motion for summary judgment under the RUA as to UEC because the immunity provision in the statute does not apply to UEC in that it uses the lake primarily for commercial purposes which triggers the "noncovered land" exception to the immunity provision. Second, they argue that the Mays are not immune under the Act because it does not apply to residential property. Next, they claim that the operational license granted to UEC by the FERC governs its duties and liabilities and not the Act because the license agreement was implemented before the statute went into effect. Finally, the appellants claim that the Act was meant to protect natural, undeveloped and unimproved property and since the dam has become a highly developed residential and commercial area, it is no longer in its natural state. Therefore, it is not protected by the Act.

## II. Standard of Review

The standard of review for a summary judgment is governed under Rule 74.04 and set out in *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*[3] In reviewing a grant of summary judgment, we examine the entire record to determine whether there is any issue of material fact and whether the moving party was entitled to judgment as a matter of law.[4] We will

---

1. The appellants did not timely appeal the trial court's order granting the Mays' motion for summary judgment regarding the boat permit, so we will not address it on this appeal.

2. All statutory references are to RSMo 1994 unless otherwise indicated.

3. 854 S.W.2d 371, 376 (Mo. banc 1993).

4. *Dial v. Lathrop R–II School Dist.*, 871 S.W.2d 444, 446 (Mo. banc 1994); Rule 74.04(c)(3).

review the record in the light most favorable to the party against whom summary judgment was entered.[5] We accord the non-movant the benefit of all reasonable inferences from the record.[6] The propriety of summary judgment is purely an issue of law.[7] Our review is essentially de novo.[8]

## III. Legal Analysis

### A. Purpose of the Recreational Use Act

The interpretation of the RUA is an issue of first impression, and therefore we must carefully examine the statute in order to determine, "the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning."[9] When deciding whether a statute is clear and unambiguous so as to ascertain the intent of the legislature, the appellate court must consider whether the language is plain and clear to a person of ordinary intelligence.[10] Only when the language is ambiguous or if its plain meaning would lead to an illogical result will the court look past the plain and ordinary meaning of a statute.[11]

Every state of the Union has adopted statutes similar to the RUA.[12] In

5. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 376.

6. *Id.*

7. *Id.*

8. *Id.*

9. *Farmers' & Laborers' Coop. Ins. Ass'n v. Dir. of Revenue*, 742 S.W.2d 141, 145 (Mo. banc 1987); *see also Mickey v. City Wide Maint.*, 996 S.W.2d 144, 148 (Mo.App. W.D.1999) (quoting *Betz v. Columbia Tel. Co.*, 224 Mo. App. 1004, 24 S.W.2d 224, 228 (1930)).

10. *Wheeler v. Bd. of Police Comm'rs of Kansas City*, 918 S.W.2d 800, 803 (Mo.App. W.D. 1996) (citing *Wolff Shoe Co. v. Dir. of Revenue*, 762 S.W.2d 29, 31 (Mo. banc 1988)).

11. *Id.*

12. Ala.Code §§ 35–15–20 to 28 (1991); Alaska Stat. § 09.65.200 (Lexis 2000); Ariz.Rev. Stat. Ann. § 33–1551 (West 2000); Ark.Code Ann. §§ 18–11–301 to 307 (Michie 1987 & Supp.2000); Cal. Civ.Code §§ 846, 846.1 (West Supp.2001); Colo.Rev.Stat. Ann. §§ 33–41–101 to –106 (West 1999); Conn. Gen.Stat. Ann. §§ 52–557f to –557k (West 1991); Del.Code Ann. tit. 7, §§ 5901–5907 (1991); Fla. Stat. Ann. § 375.251 (West 2000); Ga.Code Ann. § 27–3–1 (1997), §§ 51–3–20 to –26 (2000); Haw.Rev.Stat. Ann. §§ 520–1 to –8 (Michie 1993 & Supp.1997); Idaho Code § 36–1604 (Michie 1994 & Supp. 2000); 745 Ill. Comp. Stat. Ann. 65/1 to 6⁷⁄ (West 1993); Ind.Code Ann. §§ 14–22–10–2 to 2.5 (Michie 1995 & Supp.2000); Iowa Code Ann. §§ 461C .1–.7 (West 1997); Kan. Stat. Ann. §§ 58–3201 to –3207 (1994 & Supp.1996); Ky.Rev.Stat. Ann. §§ 150.645 (Michie 1996 & Supp.2000), 411.190 (Michie 1992 & Supp.2000); La.Rev.Stat. Ann. §§ 9:2791, 9:2795 (West 1997); Me.Rev.Stat. Ann. tit. 14, § 159 A (West Supp.2000); Md. Code Ann., Nat. Res. §§ 5–1101 to 1109 (2000); Mass. Gen. Laws Ann. ch. 21, § 17C (West 1994 & Supp.2000); Mich. Comp. Laws Ann. § 13A.73301 (Lexis 1997); Minn. Stat. Ann. §§ 604A.20–.27 (West 2000); Miss. Code Ann. §§ 89–2–1 to –27 (1999); Mo. Ann. Stat. §§ 537.345 .348 (West 1994); Mont. Code Ann. §§ 70–16–301 to –302 (1999); Neb.Rev.Stat. §§ 37–729 to –736 (1991); Nev. Rev.Stat. 41 .510 (1997); N.H.Rev.Stat. Ann. § 212:34 (1989); N.J. Stat. Ann. §§ 2A:42A 2 to –10 (West 2000); N.M. Stat. Ann. § 17–4–7 (Michie 1995); N.Y. Gen. Oblig. Law § 9–103 (McKinney 1989); N.C. Gen.Stat. §§ 38A–1 to –4 (1999); N.D. Cent.Code §§ 53–08–01 to –06 (1999); Ohio Rev.Code Ann. §§ 1533.18–.181 (West 1997); Okla. Stat. Ann. tit. 2, § 1301–315 (West 1993 & Supp. 2001), tit. 76, §§ 10–15 (West 1995); Or.Rev. Stat. §§ 105.672–.696 (1999); Pa. Stat. Ann. tit. 68, §§ 477–1 to –8 (West 1994); R.I. Gen. Laws §§ 32–6–1 to –7 (1994 & Supp.2000); S.C.Code Ann. §§ 27–3–10 to –70 (Law.Co-op.1991); S.D. Codified Laws §§ 20–9–12 to 18 (Michie 1995); Tenn.Code Ann. §§ 70–7–101 to –105 (1995); Tex. Civ. Prac. & Rem. Code Ann. §§ 75.001–.004 (Vernon 1997 &

Missouri, a version of the RUA became law in 1983 upon the enactment of §§ 537.345 through 537.348. Although Missouri's statute does not explicitly state the purpose of the Act, other jurisdictions consistently state that the general purpose of these statutes is to encourage landowners to open their lands to the public for recreational use by restricting the landowners liability.[13] Thus, like many of the jurisdictions that have passed similar legislation, we believe that the Missouri legislature enacted the RUA to encourage the free use of land for recreational purposes in order to preserve and utilize our natural resources. Furthermore, Section 537.346 of our statute, relieves the landowner of any duty to keep his land safe so long as the owner does not charge a user fee. In other words, it creates a tort immunity for landowners who open their land to the public free of charge for recreational use. It is not ambiguous. It states:

> Except as provided in sections 537.345 to 537.348, an owner of land owes no duty of care to any person who enters on the land without charge to keep his land safe for recreational use or to give any general or specific warning with respect to any natural or artificial condition, structure, or personal property thereon.[14]

Landowners can, however, incur liability if there is a malicious or grossly negligent failure to warn or guard against a dangerous condition, charge a fee for entry upon the land, or come within the other exceptions contained in § 537.348.[15] Read together with the exceptions contained in § 537.348, the Act does create some ambiguity. Section 537.348 provides:

> Nothing in [sections 537.345 through 537.348] shall be construed to create liability, but it does not limit liability that otherwise would be incurred by those who use the land of others, or by owners of land for:
>
> (1) Malicious or grossly negligent failure to guard or warn against a dangerous condition, structure, personal property which the owner knew or should have known to be dangerous, or negligent failure to guard or warn against an ultrahazardous condition which the owner knew or should have known to be dangerous;
>
> (2) Injury suffered by a person who has paid a charge for entry to the land; or
>
> (3) Injuries occurring on or in:
>
> (a) Any land within the corporate boundaries of any city, municipality, town, or village in this state;
>
> (b) Any swimming pool. "Swimming pool" means a pool or tank, especially an artificial pool or tank, intended and adapted for swimming and held out as a swimming pool;
>
> (c) Any residential area. "Residential area" as used herein means a tract of land of one acre or less predominantly used for residential purposes, or a tract of land of any

---

Supp.2001); Utah Code Ann. §§ 57–14–1 to –7 (2000); Vt. Stat. Ann. tit. 12, § 5791–5795 (Supp.2000); Va.Code Ann. § 29.1–509 (Michie 1997); Wash. Rev.Code Ann. §§ 4.24.200–.210 (West 1988 & Supp.2001); W. Va.Code §§ 19–25–1 to –7 (1997); Wis. Stat. Ann. §§ 895.52, 895.525 (West 1997 & Supp.2000); Wyo. Stat. Ann. §§ 34–19–101 to –106 (Lexis 1999).

**13.** *See, e.g., Anderson v. Atlanta Comm. for the Olympic Games, Inc.,* 273 Ga. 113, 537 S.E.2d 345, 348 (2000); Ga.Code Ann. § 51–3–20 (2000); *see also* Kan. Stat. Ann. § 58–3201 (1994); Wis. Stat. Ann. § 895.52 (West 1997 & Supp.2000).

**14.** § 537.346.

**15.** § 537.348.

size used for multifamily residential services; or

(d) Any noncovered land. "Noncovered land" as used herein means any portion of any land, the surface of which portion is actually used primarily for commercial, industrial, mining or manufacturing purposes; provided, however, that use of any portion of any land primarily for agricultural, grazing, forestry, conservation, natural area, owner's recreation or similar or related uses or purposes shall not under any circumstances be deemed to be use of such portion for commercial, industrial, mining or manufacturing purposes.

Because the entire Act is at issue in this case, we will refer to various sections of the Act throughout the analysis. Therefore, it is imperative that the entire Act be cited. Section 537.345 is the definitional section of the Act and states:

As used in sections 537.345 to 537.347, the following terms mean:

(1) "Charge", the admission price of fee asked by an owner of land or an invitation or permission without price or fee to use land for recreational purposes when such invitation or permission is given for the purpose of sales promotion, advertising or public goodwill in fostering business purposes;

(2) "Land", all real property, land and water, and all structures, fixtures, equipment and machinery thereon;

(3) "Owner", any individual, legal entity or governmental agency that has any ownership or security interest whatever or lease or right of possession in land;

(4) "Recreational use", hunting, fishing, camping, picnicking, biking, nature study, winter sports, viewing or enjoying archaeological or scenic sites, or other similar activities undertaken for recreation, exercise, education, relaxation, or pleasure on land owned by another.

Then § 537.347 reads as follows:

Except as provided in sections 537.345 to 537.348, an owner of land who directly or indirectly invites or permits any person to enter his land for recreational use, without charge, whether or not the land is posted, does not thereby:

(1) Extend any assurance that the premises are safe for any purpose;

(2) Confer upon such person the status of an invitee, or any other status requiring of the owner a duty of special or reasonable care;

(3) Assume responsibility for or incur liability for any injury to such person or property caused by any natural or artificial condition, structure or personal property on the premises; or

(4) Assume responsibility for any damage or injury to any other person or property caused by an act or omission of such person.

Our analysis will begin by outlining the required factors necessary to determining whether or not UEC falls within the ambit of § 537.346. The statute requires (1) an owner of the land; (2) entry upon the land; (3) entry upon the land without charge; and (4) entry for recreational use. If all of those factors are satisfied, the owner owes no duty to the entrants to keep the land safe or to give any general or specific warnings with respect to any natural or artificial condition, structure, or personal property on the land unless one of the exceptions contained in § 537.348 apply.

 Here, the decedent and the two other deceased passengers went to the lake, owned by UEC, with a boat, and entered the lake for recreational use purposes free of charge. They were boating at the time of the accident, and no evi-

dence presented on this appeal would suggest that they went to the Lake of the Ozarks for any other reason, except to enjoy the lake. Recreational use is defined in the act as "hunting, fishing, camping, picnicking, biking, nature study, winter sports, viewing or enjoying archaeological or scenic sites, or other similar activities undertaken for recreation, exercise, education, relaxation, or pleasure on land owned by another."[16] Land is defined as "all real property, land and water...." The language of this statute is clear and unambiguous, and based on the plain and ordinary meaning of the language of the statute, we find that the legislature meant to protect lake owners from liability when accidents occur on the lake by those who are engaging in boating activities, water sports or any other "pleasure" on the water. Therefore, UEC is protected under § 537.346.

### B. The Noncovered Land Exception

█ This brings us to the next step of the analysis. We must address whether the land falls under an exception to § 537.346 excluding it under § 537.348(3)(d) from the Act's protection. This analysis is more complex, and because no Missouri court has addressed the RUA, it will require us to look to other jurisdictions with similar statutes and determine our legislature's intent in order to extinguish this issue. The appellants argue that UEC is not entitled to immunity because of § 537.348(3)(d), which provides that there is no limit of liability if the land is used primarily for commercial purposes. They claim that UEC uses the lake solely for commercial purposes, pointing out that UEC built the Bagnell Dam because more electricity was needed in an expanding ser-

vice area. Further, in order for UEC to create hydroelectric power, it had to regulate and control the entire lake surface by raising and lowering the lake elevation.

UEC argues that there was evidence that the only commercial use on the lake occurred at Bagnell Dam, nearly twenty-eight miles from the place where the accident occurred. Moreover, where the accident occurred was used primarily for recreational purposes. Further, the act contemplates that the property can have both a covered portion and a "noncovered" portion.

Section 537.346 does not limit a landowner's liability if the portion of the land where the injury occurred is used primarily for commercial, industrial, mining, or manufacturing purposes.[17] In order to discern the meaning of this statute we must define the terms of the statute and give them their plain and ordinary meaning, and determine if the legislature intended to define "noncovered land" based solely on how the owner used the land or how the land was used in general, including how the public utilized it.

█ The noncovered land exception states that any *portion* of any land, used *primarily* for commercial purposes is not immune from liability, but the next clause begins with "provided, however," and continues by explaining that use of any portion of any land used primarily for recreational purposes, shall not be considered used for commercial purposes. Since the terms "portion" and "primarily" are important to the meaning of this statute, we must define them. It is appropriate to derive a word's plain and ordinary meaning from a dictionary when it is used but not defined within a statute.[18] "Portion" is

---

16. § 537.345(4).

17. § 537.348.

18. *Am. Healthcare Mgmt., Inc. v. Dir. of Revenue*, 984 S.W.2d 496, 498 (Mo. banc 1999).

defined as "a part of a whole."[19] "Primarily" is defined as "first of all; in the first place."[20] Taken in its plain and ordinary meaning, the first clause of subsection (d) provides that any part of the whole lake, which is first of all used for commercial purposes is not immune from liability for injuries occurring thereon.

The second clause begins with "provided, however." "Provided" can either introduce a condition or exception and synonymous with "if," or it can be used as a conjunction meaning "and."[21] "Provided, however" can also be interpreted as a proviso that qualifies as an exception to a statute.[22] Generally, a proviso is confined to the clause or distinct portion of a statute to which it pertains or which immediately precedes it.[23] "A proviso does not enlarge or separately confer power or introduce independent legislation."[24] " 'The natural and appropriate office of a proviso is to create a condition precedent; to except something from the enacting clause; to limit, restrict, or qualify the statute in whole or in part; or to exclude from the scope of the statute that which otherwise would be within its terms.' "[25]

Here, the second clause qualifies the first clause. It stipulates that any portion of the land used primarily for recreational purposes, among other things, shall not be deemed to have a commercial purpose. Read together, the section not only allows a piece of land to be divided into multiple parts, each able to assume a recreational, commercial, or a combined function, but it also establishes that the portions of the land that are used primarily for recreational purposes are exempt from liability. Those portions that are used primarily for commercial purposes are "noncovered lands" and fall outside the ambit of § 537.346. Therefore, the lake can be separated into different portions, and the dam area, for instance, could be considered a commercial portion .[26]

But the appellants argue that this is a situation where commercial interests are mixed with recreational activities. Therefore, we need to determine whether or not the portion of the lake where the accident occurred was used primarily for commercial purposes or primarily for recreational purposes. Such a measure is difficult to calculate. The appellants have put dollar figures on the profitability of the power plant, noting the number of employees, UEC's earnings, and the amount of water required to maintain the project. It is impossible, however, to calculate the value of the lake for recreational purposes. People visit the lake for different recreational purposes, such as fishing, boating, water sports, camping, and swimming. These activities cannot be appreciated by a mere dollar amount. Therefore, we will not determine whether this portion of the lake was primarily used for commercial or recreational purposes by placing a monetary

**19.** Webster's Third New International Dictionary 1768 (1971).

**20.** Webster's Third New International Dictionary 1800 (1971).

**21.** *State ex inf. McKittrick v. Murphy,* 347 Mo. 484, 148 S.W.2d 527, 532 (1941).

**22.** *Commerce Bank of Kansas City v. Missouri Div. of Fin.,* 762 S.W.2d 431, 434 (Mo.App. W.D.1988).

**23.** *Id.;* 82 C.J.S. *Statutes* § 370 (1999).

**24.** *Commerce Bank,* 762 S.W.2d at 434 (citing 82 C.J.S. *Statutes* § 381(b)(2) (1953)).

**25.** *Id.* (quoting 73 Am.Jur.2d *Statutes* § 318 (1974)).

**26.** Whether the dam area should be considered a commercial portion is not before this court, so we reserve that analysis for another day.

value on the activities. Instead, we will focus on the nature of the activity and use of the portion of the land in question by the owner and guests to determine its purpose.

■■■ In determining whether the land is used for a commercial purpose or a recreational purpose, we will view the use from the standpoint of the landowner,[27] although the use by the guest is also an important consideration.[28] Since the landowner has opened the land to the public free of charge for recreational purposes, UEC is protected by the statute.[29] The decedents came to the lake intending to use it for recreational purposes free of charge. Furthermore, to suggest that the entire lake is used primarily for commercial purposes would be absurd.

The Alabama courts have been faced with similar issues. In *McElrath v. Alabama Power Co.*,[30] four children drowned below a dam. They were wading across a creek and when they got close to the dam they placed their hands in the falling water. Each one slipped into a hole 8 to 10 feet deep. This dam was not used to generate power. The court held that since the power company opened the dam site up to the public for recreational uses, and the children came to the area with the intent to use the area for recreational purposes, it had no duty to protect these children from any dangers.[31]

Further, in *Dobbs v. Alabama Power Co.*,[32] the plaintiffs' sailboat crashed into a high voltage power line and the plaintiff was injured. The court held that the plaintiff was enjoying the use of the lake as contemplated by the statute, and therefore the power company was immune from liability.[33]

Finally, in *Driskill v. Alabama Power Co.*,[34] the plaintiffs were operating a motor boat on the reservoir when it ran into a submerged tree trunk causing one of the passengers to be thrown into the water. The court held that the company was not under any duty to warn or protect the plaintiff of possible dangers because the condition was brought about by the ordinary use of the land, raising and lowering the level of the lake.[35]

Appellants compare our RUA to Oklahoma's statute and argue that if any commercial or other activity for profit is conducted on the land, the statute will not protect the owner from liability. The Oklahoma statute states, "[t]his section shall not apply if there is *any charge* made . . . for entering or using such the land or area, . . . or *if any* commercial or other activity for profit . . . is conducted on the land or area."[36] They cite to *Boyd v. United States Army Corps of Engineers*[37] and ask us to adopt the same analysis. In *Boyd*, the plaintiff was swimming and snorkeling in the lake when a boat struck and killed him. Commercial activity took

27. *Gaeta v. Seattle City Light*, 54 Wash.App. 603, 774 P.2d 1255, 1258 (1989).

28. *Anderson*, 537 S.E.2d at 349 (quoting *Silingo v. Village of Mukwonago*, 156 Wis.2d 536, 458 N.W.2d 379, 382 (1990)).

29. *See Gaeta*, 774 P.2d at 1258.

30. 554 So.2d 994 (Ala.1989).

31. *Id.* at 995–96.

32. 549 So.2d 35 (Ala.1989).

33. *Id.* at 36–37.

34. 374 So.2d 265 (Ala.1979).

35. *Id.* at 265–67.

36. Okla. Stat. Ann. tit. 2 § 1301–315(C) (West 1993 & Supp.2001) (emphasis added).

37. 830 P.2d 577 (Okla.1992).

place in the area where the accident occurred (stores, marina, restaurants, and cabins) and the defendants received revenue from those operations. The court held that based on that commercial activity, the defendant was not exempt from liability.[38]

On the other hand, the Oklahoma Supreme Court addressed the issue later in *Hughey v. Grand River Dam Authority*,[39] a case very factually similar to the one before us. The plaintiff drowned after his boat struck an abandoned railroad bridge at night on the lake. The plaintiff alleged that the defendants negligently failed to provide lighting and warning signs around the area. The court held that under Oklahoma's recreational use statutes "the type of commercial activity which takes a landowner out of the purview of immunity *must be connected with* the invitees' recreational use of the lands or waters."[40] The "generation of electricity on the land in question—its only commercial activity established by this record—has not been shown to have any *profit-related nexus to the admitted public's presence upon the premises or with its free use of the locus delicti.*"[41] Furthermore, in a footnote the court continued to explain that "[t]he Legislature clearly did *not* intend that commercial activity *unrelated* to land/water use by invited guest to be a bar to immunity. The offending commercial or other 'for-profit' activity that deprives the landowner of [the RUA's] immunity must be connected with the invited public's use of the premises."[42] Even with such a narrow statute, Oklahoma was concerned about protecting the purpose of the legislation.

## C. Matters of Public Policy

There are several policy reasons which would support a conclusion that the legislature could not have envisioned an entity such as UEC to be subject to liability for injuries occurring anywhere on 55,342 acres of land. It is inconceivable that UEC could meticulously maintain every inch of the surface waters. This lake is a place where people from across the country come to experience the pleasures and risks of the outdoors. It is an area left open for those who enjoy the outdoors and is free of charge so that no one is excluded.

It is practically impossible to maintain a large area of land used by the public for recreational use. UEC cannot close the lake for maintenance or police the area for hazards, such as floating objects and submerged tree trunks, and the owner cannot possibly protect people from risks inherent in water sports, such as drowning and boating accidents.[43] If we forced the owners of these lands to maintain them as appellants claim they should, making owners liable, we would thwart the purpose of the statute; accommodating owners would fear liability, and be discouraged from opening these lands up to the public, thus denying citizens of a significant portion of Missouri's natural resources. We cannot imagine that the legislature intended such an absurd result.

Therefore, we find that UEC's use of the property where the accident occurred is too far removed from its commercial purpose. Hence, the waterway where the

---

38. *Id.* at 577–80.

39. 897 P.2d 1138 (Okla.1995).

40. *Id.* at 1143.

41. *Id.*

42. *Hughey*, 897 P.2d at 1143 n. 16. (citing *Boyd*, 830 P.2d at 580). The only way the

landowner can lose the immunity is to involve the public with the intended for-profit activity. *Id.*

43. *Rivera v. Philadelphia Theological Seminary of St. Charles Borromeo, Inc.*, 510 Pa. 1, 507 A.2d 1, 8 (1986).

accident occurred is subject to the immunity protection of the RUA because the primary purpose of the land was recreational, and does not fall within the "noncovered land" exception. Point I is denied.

### D. Exceptions to the Recreational Use Act

Appellants' fourth point also raises an issue involving the statutory interpretation of the RUA as it pertains to UEC, so we will address it next. They argue that the Act was targeted to protect natural, undeveloped and unimproved property, and the lake has too much residential and commercial activities to allow it to be protected by the act. Again, since this is an issue of first impression, we will apply the same standards as applied in Point I and determine the intent of the legislature from the language used and consider the words used in the statute in their plain and ordinary meaning.[44] When deciding whether a statute is clear and unambiguous so as to ascertain the intent of the legislature, the appellate court must consider whether the language is plain and clear to a person of ordinary intelligence.[45] Only when the language is ambiguous or its plain meaning would lead to an illogical result will the court look past the plain and ordinary meaning of a statute.[46]

▋ Land is defined in the statute as "all real property, land and water, and all structures, fixtures, equipment and machinery thereon ."[47] All real property would include the lake property. The use of the words "structure, fixtures, equip-

ment, and machinery" demonstrates that the legislature anticipated some development on the real property. Property in its true natural state would lack equipment, structures, fixtures, or machinery. Further, § 537.346, *supra*, states that the owner is not required to give any warnings with respect to "any *natural* or *artificial* condition, structure, or personal property thereon."[48] Again, this indicates that the legislature intended the statute to evolve and include undeveloped as well as developed property because the words "artificial condition, structure or personal property" prophesize development upon the land.

▋ Finally, the exceptions to the immunity section of the Act do not include an exemption for developed land.[49] The residential exception does not apply. It defines residential as "a tract of land of one acre or less predominantly used for residential purposes, or a tract of land of any size used for multifamily residential services."[50] The lake is approximately 55,342 acres of water, eliminating it from the exception in the first clause. The second clause places no limit on the acreage but specifically excludes land that is used for multifamily residential services. A "residential unit" is defined as "one (1) or more rooms for the use of one (1) or more persons as a housekeeping unit with space for eating, living and sleeping, and permanent provisions for cooking and sanitation."[51] Residential property has also been defined by statute as "all real property improved by a structure which is used or intended to be used for residential liv-

44. *Farmers' & Laborers' Coop. Ins. Ass'n,* 742 S.W.2d at 145.

45. *Wheeler,* 918 S.W.2d at 803.

46. *Id.*

47. § 537.345(2).

48. § 537.346 (emphasis added).

49. § 537.348

50. § 537.348(3)(c).

51. *Deaconess Manor Ass'n v. Public Serv. Comm'n,* 994 S.W.2d 602, 605 (Mo.App. W.D. 1999) (quoting 4 CSR 240–20.050(1)(G)).

ing by human occupants...."[52] A multiple occupancy building is "a building or premises which is designed to house more than one (1) residential or commercial unit."[53] "Service" is defined as "supplying of a public need; assistance or benefit given."[54] The statute contemplates the owner of the land supplying residential housing units for multiple families. There is no evidence in the record before us to suggest that UEC provided multifamily residential services on the lake. Although residential housing exists around the lake, UEC does not own that land. The land in question is the lake. Therefore, this exception does not apply to UEC.

Next § 537.348(3)(a), states that the owner is liable for injuries that occur upon his land if the land is "within the corporate boundaries of any city, municipality, town, or village in this state." Our research does not uncover any jurisdiction that adopted this same exception within their Act. It is our belief that the legislature included this exception in lieu of arbitrarily deciding what constituted developed land and undeveloped land. If the land is located within the corporate boundaries of any city, municipality, town or village, it is not immune from liability. Here, Gregory D. Williams, the city attorney for Sunrise Beach, submitted an affidavit, which stated that the area within the 27.8 mile marker where the injury occurred, was not within the corporate boundaries of any city, municipality, town or village. Therefore, this exception does not apply to UEC.

Moreover, appellants' reliance on Michigan's, Pennsylvania's, and Utah's Recreational Use Acts and common law interpretations of those statutes is not convincing. Missouri's statute is substantially different from those states and includes specific exceptions that those jurisdictions do not entertain. Appellant relies on *Baritault v. Salt Lake City, Corp.*,[55] where a child was injured in a city park, and the court held that Utah's recreational use statutes did not apply.[56] Section 537.348(3)(a) of our statute would have prevented the park owner from using the act as a defense because the park was located in the city of Salt Lake City, further evidencing the legislature's intent to shield property such as the lake.

The appellants also attempt to draw a connection between *Harris v. Vailliencourt*[57] and the case before us. There the court held that the property owners of a private lake were not protected by Michigan's recreational use act after the plaintiff was injured in a diving accident.[58] The accident took place in a residential owner's back yard in a subdivision. The homeowner's association owned the lake. The court pointed out that the legislature, in enacting this statute, intended to "promote tourism or to open up and make available vast areas of vacant, undeveloped land to the use of the general public."[59] Again, it is clear from § 537.348(3)(c) that our legislature did not enact our RUA to protect private property owners of small tracts of land. Hence, we do not find any of the

---

52. § 137.016.1(1).

53. *Deaconess*, 994 S.W.2d at 605 (quoting 4 CSR 240–20.050(1)(F)).

54. The Oxford Desk Dictionary and Thesaurus 727 (1997).

55. 913 P.2d 743 (Utah 1996).

56. *Id.* at 744–49.

57. 170 Mich.App. 740, 428 N.W.2d 759 (1988).

58. *Id.* at 760–62.

59. *Id.* at 761.

appellants' arguments convincing, and UEC, therefore, is protected by the act.

### E. Licensing Agreement

 Next, the appellants argue that the licensing agreement between UEC and the FERC preclude UEC from arguing the RUA as a defense for liability. Appellants cite no case law to support their contention. Further, appellants argue that UEC's motivation for allowing the public on the lake is to comply with the FERC licensing agreement, which allows UEC to use the lake's resources to produce hydroelectric energy. The purpose of the statute is to protect landowners from liability when they open their land to the public for recreational use free of charge, regardless of whether the landowner was induced to make these lands available prior to the Act.[60] We find appellants' argument is without merit. Point denied.

### F. The Recreational Use Act as Applied to the Mays

 The Mays were also a party to this suit, and the final point on appeal raises an issue regarding their liability and immunity under the RUA. The appellants contend that the Act does not apply to the Mays because they own a tract of land used for residential purposes, which removes them from the purview of the statute under § 537.348(3)(c). The Mays, however, argue that the act bars claims by recreational users of land and the residential area exception does not pertain to the dock located on the lake. The Mays also

claim that the accident did not occur of their property, and instead argue that the boat hit the shoreline prior to crashing into their dock and catwalk.

In order for this court to address the issue of whether the Mays fall within the exception of § 537.348(3)(c), the trial court or a jury must determine if the boat hit the shore before hitting the Mays' dock, or whether the boat crashed into the dock prior to hitting the shore. This is a question of fact left for the trial court or a jury to decide. If the boat hit the shoreline first, UEC, as the owner of the shoreline, would be immune from liability as discussed *supra* under the RUA. On the other hand, if the accident resulted from the boat crashing into the dock and catwalk, the Mays are not immune from liability under § 537.346 if they own the dock because their property falls within the residential area exception, § 537.348(3)(c).

The purpose of the statute is to preserve our state's resources by encouraging property owners to open large areas of land to the public free of charge for recreational purposes. The Mays' dock is not an area of land open to the public. Instead, it is an extension of their real property. The Mays' property lines extend lakeward.[61] Thus, any structure, including a dock would be an extension of the Mays' residential area, which is not included within the scope of this act. Therefore, determining how the accident occurred is a genuine issue of material fact. Because we find that genuine issues of material fact

---

**60.** *See Gaeta,* 774 P.2d at 1258 (holding that where the defendant, in order to engage in commercial activity, was compelled to open up a lake to the public for recreational purposes, a lease or franchise provision preceding the Act was not a bar to immunity); *Livingston v. Pennsylvania Power and Light Co.,* 609 F.Supp. 643, 647 (E.D.Pa.1985) (holding that where the power company entered into a

licensing agreement that required it to dedicate the land to the public in order to use the land for commercial purposes, the licensing agreement did not preclude the landowner from seeking immunity under the recreational use statutes).

**61.** *Paul v. Jackson,* 910 S.W.2d 286, 293 (Mo. App. W.D.1995).

remain in this case, summary judgment was not proper, and we reverse and remand.

## IV. Conclusion

The circuit court's grant of summary judgment for the respondents, the Mays, is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion. With respect to the respondent, UEC, we affirm the trial court's judgment and find that the motion for summary judgment was properly granted based on the Recreational Use Act, § 537.345 *et seq.*

LOWENSTEIN, J., concurs.

HOLLIGER, J., dissents in separate opinion

HOLLIGER, Judge, dissenting.

I respectfully dissent from that portion of the majority opinion that affirms summary judgment in favor of Union Electric Company. I do not agree that the liability limiting provisions of the Recreational Use Act (RUA), §§ 537.345 through 537.348, apply to Union Electric Company and the surface waters of the Lake of the Ozarks. The majority has done a commendable and scholarly job of researching and analyzing similar statutes and interpretative decisions in a number of other states. The enactments of the various states, however, have widely varied in scope, terminology and exceptions. In my view, therefore, they have only limited value in analyzing and applying Missouri's version of the RUA.

The majority correctly notes that the RUA does not expressly delineate its purpose. This writer does not believe that the RUA was intended to apply to Union Electric at the Lake of the Ozarks because its use of the lake waters was commercial, not recreational, and the availability of the waters for recreational use is solely because of conditions imposed by its regulatory permit for operation of a hydroelectric facility on a navigable stream of the United States.

Where the legislature fails to state expressly the purpose of a legislative enactment we should look to the words and meaning of the statute as a whole to attempt to discern the statute's intent. *Union Electric Co. v. Platte–Clay Elec. Co-op.*, 814 S.W.2d 643, 647 (Mo.App.1991). Section 537.345(4) defines the term "recreational use" for purposes of the RUA:

> [H]unting, fishing, picnicking, biking, nature study, winter sports, viewing or enjoying archaeological or scenic sites, or other activities undertaken for recreation, exercise, education, relaxation, or pleasure on land owned by another.

Boating is not expressly included in § 537.345(4) unless one would argue it falls within the generic description of "similar activities." In my view it requires some leap of logic to believe that the Missouri legislature, cognizant of the thousands of acres of water in large Missouri lakes intended to generally lump the recreational boating use of those lakes in the term "similar activities."

This conclusion, it is submitted, is buttressed by the definition of the term "charge" in § 537.345(4):

> [T]he admission price or fee asked by an owner of land or an invitation or permission without price or fee to use land for recreational purposes when such invitation or permission is given for the purpose of sales promotion, advertising or public goodwill in fostering business purposes.

In other words, if the invitation is given with some business purpose or benefit, even indirect, then it is deemed with

"charge" and the landowner is not protected by the RUA.

Here Union Electric has invited or permitted the public to use the waters of Lake of the Ozarks not for some altruistic, non-commercially related reason but because it is required to do so by its federal regulatory permit. The lake exists for the commercial production of hydroelectric power with a secondary purpose of flood control again mandated by federal regulation. Its availability for recreational use by the public is merely a requirement imposed by the federal government as a condition to Union Electric's damming of a navigable waterway.

It is clear from § 537.348 that the RUA is intended to limit liability that might otherwise exist at common law. Such statutes should be strictly construed. *Overcast v. Billings Mutual Ins. Co.*, 11 S.W.3d 62, 69 (Mo. banc 2000). The majority in my opinion has too broadly construed this statute to supply immunity instead of striking the balance in favor of retaining the common law remedy. *Id.*

This opinion is not intended to suggest any view on the merits of the liability theory urged against Union Electric. It is merely intended to state the view that immunity for Union Electric was not intended by the RUA and that summary judgment should have not been granted on that ground.