## THE STATE v. MARION SONNER, Appellant.

**Division Two, December 9, 1913.**

1. **FELONY OF ABORTION: Manslaughter: Sec. 4458, R. S. 1909.** A defendant prosecuted under an information charging manslaughter in the second degree as defined by Sec. 4458, R. S. 1909, cannot be convicted of "the felony of abortion."

2. **MANSLAUGHTER: Evidence: Death of Quick Child: Sec. 4458, R. S. 1909.** In order to sustain a conviction under an information charging manslaughter in the second degree (as

defined by Sec. 4458, R. S. 1909), by causing a woman to take certain drugs and medicines which resulted in the death of a quick child, the proof must show that the death of the quick child was so caused.

3. ——: ——: ——: **Drugs: Negativing Exceptions.** In a prosecution under an information charging manslaughter in the second degree (as defined by Sec. 4458, R. S. 1909), by causing a woman to take certain drugs and medicines which resulted in the death of a quick child, the burden is upon the State to show that the use of the drugs and medicines was not necessary to preserve the life of the woman or of the child.

Appeal from Lincoln Circuit Court.—*Hon. James D. Barnett*, Judge.

REVERSED AND REMANDED.

*William A. Dudley* for appellant.

*John T. Barker,* Attorney-General, and *Ernest A. Green,* Assistant Attorney-General, for the State.

WILLIAMS, C.—The information in this case originally consisted of four counts but before proceeding to trial the prosecuting attorney dismissed the first, third and fourth counts and defendant was tried upon the second count in the information. That count charges defendant with manslaughter in the second degree under section 4458, Revised Statutes 1909. The information charges, in substance, that the defendant, intending to produce a miscarriage or abortion, caused to be taken by one Emma Russell, a married woman, pregnant with a quick child, certain drugs and medicines; it being alleged that the same was not necessary to preserve the life of said Emma Russell, or said quick child, and that same had not been advised by a duly licensed physician to be necessary for such purpose and that same produced the miscarriage and abortion of said Emma Russell, result-

*Felony of Abortion:
Manslaughter:
Sec. 4458,
R. S. 1909.*

ing in the death of said quick child.   Trial was had in
the circuit court of Lincoln county, Missouri, in the
March term, 1910, resulting in a verdict by the jury,
as follows:

"We, the jury, find the defendant guilty of the
felony of abortion and we assess his punishment at one
year in the county jail and to pay a fine of one thou-
sand dollars.  Josiah Whiteside, Foreman."

Motions for new trial and in arrest of judgment
were duly filed and overruled and sentence duly en-
tered upon the verdict.   The appeal was erroneously
allowed to the St. Louis Court of Appeals and said
Court of Appeals properly certified the case here.  The
evidence tends to substantiate the following facts: The
alleged crime occurred in July, 1909, at the town of
Hawk Point, in Lincoln county, Missouri.   Defendant
was engaged in operating a meat market and also a
livery stable at said place.   Mrs. Emma Russell, a
married woman, also resided in said town, and up to
February 1, 1909, she and her husband, William Rus-
sell, conducted a boarding house.  On February 1, 1909,
Mrs. Russell and her husband separated and never
lived together again as husband and wife, but Mrs.
Russell continued to live in the town of Hawk Point.
Viola Gordon, the sixteen year old daughter of Mrs.
Russell by her first husband, testified that from Febru-
ary 1, 1909, until after the occurrence of the alleged
abortion, the defendant was a frequent caller at Mrs.
Russell's home, calling there almost every evening
about eight o'clock and remaining, generally, until
eleven o'clock and sometimes until two or three o'clock
in the morning and on a few occasions all night. That
upon these calls defendant would kiss Mrs. Russell and
she would sit upon his lap and they would act as lovers.
That she had seen them in bed together two or three
different times and on one occasion when they were
undressed.   About the middle of June Mrs. Russell
began complaining of being unwell and after July 1st

grew worse until she miscarried on July 23, 1909. Between four and eight days prior to the miscarriage, defendant gave Mrs. Russell twenty-five cents worth of calomel tablets and told her to take three tablets every hour for two days and two nights. Mrs. Russell took two tablets each hour during the first day, and then missed taking the same for two days and on the fourth day continued taking the calomel tablets until bed-time. That defendant made visits to the house, during the time that Mrs. Russell was taking the calomel, and was there every evening just preceding the miscarriage. On the fourth day, Mrs. Russell became sick at her stomach and vomited, and became so sick that she went to bed. On the following Saturday (the evidence does not show how much time elapsed between the time when she last took calomel and when she sent for the doctor), Mrs. Russell sent the witness to call Dr. Diggs to attend her. Dr. Diggs came and remained two hours attending Mrs. Russell through the miscarriage. The next morning, before daylight, witness buried the fetus in the woodshed and says that the fetus was a male child. The next night defendant brought Mrs. Russell a breast pump. Witness also testified that defendant gave Mrs. Russell six dollars with which to pay the doctor's bill. On the advice of Mrs. Russell's father and mother, the witness left home in November, 1909, and had not seen her mother since. Dr. Diggs testified that when he arrived at Mrs. Russell's home he found her in the act of aborting and he proceeded to deliver her of a child; that in his opinion the fetus was about five months old and that it was what is known as a quick child; that during the operation Mrs. Russell told the doctor that it was a "legitimate" child; that when he arrived the child was dead and upon delivering the same found that its head had been previously severed from its body and that the child had not been dead very long; that, in his opinion,

it would have taken a scientific manipulation to have severed the head from the body of the fetus, in the position which the fetus occupied in the womb (the feet projecting foremost), and that the head could not have been severed by pulling upon the feet of the unborn child. The doctor stated that he did not know what was the cause of the abortion and named several things that might have caused it, and stated that while calomel would not, necessarily, cause an abortion, yet it might produce such a result, if taken in excessive amounts. The doctor further testified that on July 19, 1909, Mrs. Russell called at his office and stated that she was troubled with discharge of the womb and the doctor refused to prescribe for her unless she would allow him to make an examination as to her ailment. Five other physicians testified, in effect, that while the taking of calomel would not necessarily produce an abortion, yet it would be dangerous for a pregnant woman to take an excessive amount of the same and that an excessive amount might in some instances produce an abortion. A number of other witnesses testified to seeing defendant at the home of Mrs. Russell, on different occasions, both in the daytime and at night, and that defendant boarded at Mrs. Russell's a short time. Dr. Shepard testified, on behalf of defendant, that on April 23, 1909, he treated Mrs. Russell and prescribed a drug to stop the hemorrhage of the womb, with which she was then suffering. Allie Monroe testified that he was at the preliminary hearing when Viola Gordon testified and that he did not hear her testify to many things that she testified to at this trial. John Ernest testified that a short time after the preliminary examination, Mrs. Russell's father, the prosecuting witness in this case, said that "he had worked mighty hard to get to catch him (Sonner) and that he thought he had caught him where he could get him; that they had the evidence all fixed." William Weeks

testified that he was in the employ of defendant during the month of July, 1909, and that from the twentieth to the twenty-fifth of July defendant remained at his home, taking care of his wife, who was then sick. Defendant's wife testified that defendant spent most of his evenings at home and was at home the entire evenings of July 22, 23, and 24, 1909. Defendant did not take the stand.

## OPINION.

1. The information charges defendant with manslaughter in the second degree under section 4458,
**Distinct Offenses.** Revised Statutes 1909. The court instructed on manslaughter in the second degree and also, by its instruction number two, instructed as to the "felony of abortion," and the jury found the defendant guilty of the "felony of abortion." The giving of instruction number two constituted reversible error. In the recent case of State v. Dargatz, 244 Mo. 218, this court fully considered the identical point here involved and speaking through Brown, P. J., announced the following conclusion:

"After a careful consideration of section 4458, Revised Statutes 1909, we are of the opinion that the crime of the felony of abortion is not included within the charge of manslaughter in the second degree, as defined by that section. The statute expressly recites that where the death of the female (or quick child) does not result from the unlawful acts of defendant he may be convicted of the felony of abortion. In this case the charge is that Mrs. Hawkins died as the result of defendant's criminal operation, and he should therefore have been convicted of the crime of manslaughter in the second degree or acquitted. . . . The two offenses denounced by said section 4458 are so inconsistent with each other that they cannot both be charged in the same indictment."

II. Appellant contends that the evidence is insufficient to sustain a conviction. While it is impossible to foresee what the evidence might be **Evidence.** upon another trial of this case, yet, since the case must be remanded, it is perhaps advisable that we make some observations concerning the sufficiency, or rather the insufficiency, of the present evidence to sustain a conviction of manslaughter in the second degree as defined by said section 4458.

It will be noted that under the present information it becomes necessary to prove that the death of the quick child was occasioned by the use of some drug. The present evidence fails to show that the death of the quick child was so caused. On the other hand the evidence tends to show that the severing of the head of the fetus, prior to its delivery, by the use of some instrument, by some unknown person, was perhaps the probable cause of its death.

The burden was also upon the State to prove that the use of the drug was not necessary to preserve the life of Mrs. Russell or that of the unborn child. [State v. Meek, 70 Mo. 355; State v. Schuerman, 70 Mo. App. 518; State v. Aiken, 109 Iowa, 643; State v. Clements, 15 Oregon, 237; Moody v. State, 17 Ohio State, 110.] It is true that in the cases of State v. Castro, 231 Mo. 398, and State v. Dargatz, 244 Mo. 218, it was held that a showing upon the part of the State to the effect that the pregnant woman was in a healthy condition just prior to the alleged criminal act, would be sufficient prima-facie proof that the taking of the drug was not necessary to preserve the life of the woman or that of the quick child. However, in the present case, there was no such showing, but, on the other hand, the evidence tends to show that Mrs. Russell had been unwell for the period of a month next preceding the alleged occurrence. The evidence therefore fails to show such facts or circumstances from which the jury could infer

or find that the taking of the drug was not necessary for the purpose above mentioned.

If, therefore, the evidence produced upon another trial upon the same information should fail to supply the above required additional proof, the trial court should direct an acquittal.

The judgment is reversed and the cause remanded. *Roy, C.*, concurs.

PER CURIAM.—The foregoing opinion of WILLIAMS, C., is adopted as the opinion of the court. All the judges concur.