THE STATE v. ANNIE SMITH, Appellant.—130 S. W. (2d) 550.

Division Two, July 7, 1939.

*Eugene L. McGee* for appellant.

1130

*Roy McKittrick*, Attorney Géneral, and *Tyre W. Burton*, Assistant Attorney General, for respondent.

COOLEY, C.—Appellant, defendant below and whom we shall refer to as defendant, appeals from a conviction, in the Circuit Court of Butler County, of manslaughter, and sentence, pursuant to a jury verdict, to pay a fine of $750. The offense of which defendant was

convicted is a felony. ■ The prosecution is by indictment which charges that defendant, "on or about the 29th and 30th days of November, 1935," feloniously, etc., used upon one Ada Garrett, "a pregnant woman" certain instrument or instruments with intent to promote and produce a miscarriage and abortion, from which alleged unlawful operation the said Ada Garrett died. The indictment is assailed on but one ground, viz., that it is void for uncertainty in that it charges the offense to have been committed on *two* dates, November 29th and 30th, 1935. Otherwise it is substantially in form heretofore approved by this court. [See State v. Goodson, 299 Mo. 321, 252 S. W. 389; State v. Anderson, 298 Mo. 382, 250 S. W. 68; State v. Decker, 340 Mo. 972, 104 S. W. (2d) 307.] The date of the offense charged in an indictment is ordinarily not conclusive on the State and not vital, as has been frequently held. Citation of authorities is needless. In the instant case the State's evidence—the dying declaration of said Ada Garrett, which will be more particularly considered hereinafter—tends to show that defendant operated upon her twice—once on November 29th and again on November 30th, 1935—as parts of a continuous treatment for the same alleged unlawful purpose, viz.—the production of a miscarriage or abortion. We think it obvious, without discussion, that the naming of both dates did not prejudice defendant and did not invalidate the indictment.

The chief question which challenges our consideration is whether or not the State made out a sufficient case to sustain the verdict of guilty—a question sufficiently presented by the record and which requires a somewhat detailed statement of the facts. The State's evidence tended to show the following:

Defendant was a licensed and practicing Osteopathic physician and surgeon, having—it seems to be conceded—a hospital at Poplar Bluff, Missouri. On November 29, 1935, Ada Garrett (whom, for convenience and brevity, we may refer to as deceased), went to defendant's hospital, the Smith Hospital, and received treatment of some sort. Deceased was a married woman, living with her husband, and having a family of six children, the oldest of whom, a son, Belvie, was then about nineteen years of age. The family lived together, the oldest son, Belvie, being at home part, but not all, of the time. Shortly before November 29, 1935, deceased left her home, leaving word (how, not disclosed) "that she was going some place." Later—a week or so, —her husband discovered her (how, not here material) at the Smith Hospital. She was in bed, apparently—supposedly—sick. She was taken home. The record is not clear as to what her condition was then nor until the family physician, Dr. Harwell, was called. During the interim "she wasn't up—she was sick." "Her legs were swelling and her stomach."

Dr. Harwell, the family physician, testified that he was asked to

see deceased "about February, 1936 (note, it must have been late January, as will later appear). His then examination disclosed that deceased had a temperature of "98-6; pulse rate 150; blood pressure 90 over 70 and some albumin in the urine; some rales in the chest;" "her legs were swollen and the abdomen seemed to have a fluid in there." He made no vaginal examination and no further examination, but advised that she go to a hospital. She was thereafter taken to the Poplar Bluff Hospital. That examination appears to have been made at Dr. Harwell's office on January 30, 1936. Dr. Harwell testified that previously he had been family physician for the Garrett family and that deceased—how long before is not shown but evidently not recently before—had appeared to be in good health, "comparably,"—"their family was a type, a little underweight, not just as vigorous as some families." He knew nothing of any history of tuberculosis "connected with her"—(mentioned hereinafter).

Dr. B. J. McCauley testified in substance that:—He was connected with the Poplar Bluff Hospital as physician and surgeon, and as such treated deceased, who was admitted to the hospital January 31, 1936, and died there February 15, 1936. He examined her when she entered the hospital, finding her suffering from a "blood stream infection and an abscess of the left lower quadrant of the abdomen, edema and swelling of the left leg, foot and thigh, and from pulmonary tuberculosis;"—"edema" meaning "swelling that will pain on pressure." The tubercular condition was active, affected both lungs and involved—(estimating)—about one-sixth of the lung tissue. It was a condition that would "run down a person's resistance." In his opinion an "active condition like that" could not be cured but "to arrest a case of that kind is a matter of opinion. It varies in people." He thought that if it could be arrested at all it would take not less than a year or maybe two. He also found some small "calcified areas" in deceased's lungs, indicating earlier tubercular conditions which had been "healed up" or arrested. The active tubercular condition, in his opinion, had existed for at least six months or a year, and perhaps longer. When brought to the hospital deceased was in a "severe condition," "a hopeless condition."

The immediate cause of death was "a hemorrhage in the left iliac vein down through the vagina." The left iliac vein is "just a little bit behind and to the left of the womb." The hemorrhage was caused "from the rupturing of the vein, and the vein rupturing was due to the presence in it at that point of an infected blood clot called a thrombus and that blood clot, that infection in that blood clot eroded through the vessel wall. Deceased's blood stream was infected when she came into the hospital, the infection being caused "by that infected thrombus breaking off into the blood stream."

"Q. What, in your opinion, Doctor, was the cause of the abscess or the septicemia?" A. The septicemia, in my opinion, was due to an

infection that spread from the rupturing of the vaginal wall." He did not know "what kind of germ" caused the infection and resulting abscess. He described the vaginal wall as being of very tough texture and in thickness as varying, he thought, "somewhere between an eighth of an inch and an eighth and a quarter thick."

Dr. McCauley further testified that he performed an autopsy upon deceased, of which he said:

"The autopsy showed a large abscess cavity containing about four ounces of thick yellow creamy pus, and several blood clots in the left lower quadrant of the abdomen. This abscess had eroded through the left iliac vein in which there was a large infected thrombus. The abscess cavity extended downward along the left border of the uterus, that is, the womb and cervix which is the outlet of the womb communicating with the vagina by means of an opening just to the left of the cervix. It was through this abscess cavity from the iliac vein to the vagina that the hemorrhage occurred."

He further said that he found a hole in the vaginal wall to the left of the cervix, "about the size of your little finger or a little larger," with "irregular edges" and which "appeared like it had been there for a long time." [He was not asked and did not explain what he meant by "a long time."] He said such a hole could have been made by "some kind of a blunt instrument like a curet or something of that sort." He again stated, in answer to a question, that the immediate cause of death was the hemorrhage, and: "Q. And that was caused from this abscess, I believe you say, from this blunt instrument being inserted through the wall of the vagina? A. That was my opinion." He further testified that he knew nothing of Mrs. Garrett's condition prior to her admission to the hospital on January 31, 1936.

The State introduced a dying declaration, made by deceased on February 3, 1936, which we quote:

"I, Mrs. Ada Garrett, having been informed by Dr. B. J. McCauley that I am going to die and I am making the following statement knowing that I am going to die. I am now in full possession of my mental faculties and give this statement freely without coercion and to the end that it may aid in bringing justice to those responsible for my condition.

"I do hereby swear and affirm that I was pregnant for a period of four or maybe six weeks prior to my entering the Smith Hospital at Poplar Bluff, Missouri, on November 29th, 1935, and entered said hospital for the purpose of having said pregnancy terminated by one Mrs. Annie Smith. When I entered the Smith Hospital I was in good health and had been in good health over a long period of years.

"I entered said hospital about twelve o'clock noon November 29th, 1935, and about three hours later was taken to the operating room and my womb dilated with an instrument. The following day, No-

vember 30th, 1935, I was again taken to the operating room and my womb scraped out with an instrument. I was not put to sleep for either one of these procedures and was well able and did witness what transpired both times. Mrs. Annie Smith was the one who did the work on me. I remained in the hospital for six to eight weeks, but am not sure the exact date that I left the hospital.

"Ernest Raulston was the one who took me to the Smith Hospital. It was through his advice that I went to this hospital. He said that he would take care of the bill at Smith's Hospital. Ernest Raulston visited me several times while I was a patient at the said hospital. I think it was Ernest Raulston who got me pregnant, but I am not sure.

"I have made the foregoing statement to be the truth and I am signing it of my own free will.

"Witnesses:

"Vera Johnson

"Margaret Stewart

"Lester Massingham                    (Sgd.) *Ada Garrett*"

"B. J. McCauley

Such was the State's case. The defendant testified, briefly and in substance that she had not used upon the deceased any instrument, that she was a licensed Osteopathic physician and surgeon, and had known deceased only "when she came to the hospital,"—meaning, evidently, defendant's hospital.

We have summarized at some length the salient facts upon which depends the solution of the question whether or not the evidence is sufficient to sustain conviction. In our opinion the evidence is insufficient.

█ I. It has been uniformly held by this court that in cases of this kind it is incumbent on the State to prove that the operation for production of an abortion or miscarriage was not necessary in order to preserve the life of the woman or that of an unborn child, if performed by a licensed physician, or if performed by some other person that it was not advised as so necessary by a licensed physician, and that a conviction cannot be permitted to stand in absence of substantial evidence tending to show that the deceased was in good health before the operation and that an operation was not necessary. [State v. DeGroat, 259 Mo. 364, 168 S. W. 702; State v. Smith, 336 Mo. 126, 76 S. W. (2d) 1077; State v. Goodson, 299 Mo. 321, 252 S. W. 389.] We have also held, recognizing the difficulty—we have said the futility—of actual proof of non-necessity, that a prima facie case is made out by proof of the fact that the woman was in good health or in her usual and ordinary condition of health, immediately prior to the commission upon her of the abortion charged. [State v. DeGroat, supra; State v. Smith, supra.] In the instant case the husband and the nineteen-year-old son of deceased testified in substance that she

appeared to be in good health, performing her usual household duties, up to the time she left home to go to the Smith Hospital. Standing alone, that testimony, coming though it did from lay witnesses, might be sufficient to make a prima facie showing of non-necessity for the operation, if one was performed. But it does not stand alone nor uncontradicted. *The State* also introduced the testimony of Dr. McCauley showing that when the deceased went to the Smith Hospital she was and for some time had been afflicted with pulmonary tuberculosis, active and doubtless progressive and involving at the time of his examination, January 31, 1936, a considerable portion of both lungs. According to his testimony as to the length of time the disease had existed, actively, prior to his examination, deceased was afflicted therewith when she entered the Smith Hospital and had been for some time. Whether or not a woman in her condition, as shown by the State's evidence, could with safety go through pregnancy and childbirth is not shown by any evidence in the case. The jurors, being laymen, cannot be presumed to have had expert knowledge on that subject. In such situation we are inclined to think the evidence on that question was insufficient.

II. For another reason we think the State's case fails, viz., want of corroboration of deceased's dying declaration as to the alleged fact that an abortion or miscarriage had taken place. Section 3690, Revised Statutes 1929 (Mo. Stat. Ann., p. 3240), provides that in prosecutions for abortion or for manslaughter occasioned by an abortion or miscarriage, or by an attempt to produce either, or attempted abortion, or for any crime of which abortion or miscarriage may be part of the essential facts to be proven, the dying declarations of the woman whose death is charged to have been caused thereby shall be competent evidence on trial of any person charged with such crime, with like effect and under like limitations as apply to dying declarations in cases of felonious homicide, *provided* (among other things not necessary here to consider), "that no conviction shall be based alone upon such declarations unless corroborated as to the fact that an abortion or miscarriage has taken place . . ."

The above statute (under a then different section number) was considered by this court in State v. Keller, 287 Mo. 124, 229 S. W. 203. That case was a prosecution for manslaughter, alleged to have been caused by an illegal operation performed with intent to produce an abortion or miscarriage upon one Mabel Hitz, from the effects of which she died. (Similar to the instant case.) The court referred to and considered State ex rel. Gaston v. Shields, 230 Mo. 91, 130 S. W. 298, wherein the court said, 230 Mo. l. c. 103, 130 S. W. l. c. 301:

"The production of abortion is not the offense denounced by the statute, but *the intent* to produce a miscarriage or abortion, by ad-

ministering drugs, using instruments, etc., *where the act is not a medical necessity.* The *intent* constitutes the *gravamen* of the offense, and the *failure* of the *attempt* has no bearing whatever upon the guilt of the defendant, as the actual production of a miscarriage is unnecessary to the completion of the offense. (Italics ours.)''

In State ex rel. v. Shields, supra (cited by respondent), the prosecution was for an attempted abortion, it not appearing that the woman had died, and the application and effect of Section 3690, supra, was not involved or considered. Respondent also cites State v. Bickel (Mo.), 177 S. W. 310, which cites with approval State ex rel. v. Shields, supra. In the Bickel case there was no dying declaration and the application and effect of Section 3690, supra, was not involved or considered.

State v. Keller, supra, seems to us clearly in point. After pointing out that, without the dying declaration of the deceased, there was no substantial evidence that said Mabel Hitz was pregnant when the alleged illegal operation was performed or that the defendant had performed or attempted to perform on her any operation, the court said, 287 Mo. l. c. 129, 229 S. W. l. c. 204:

''In order to sustain a conviction based alone upon the dying declarations of Mrs. Hitz, it was necessary for the State to show she was pregnant when the alleged operation was performed. As there is nothing in the record tending to show that Mabel Hitz was pregnant in April, 1918, her dying declarations uncorroborated as aforesaid, were insufficient to sustain a conviction in this case. In other words, before a conviction can be upheld, based alone upon said dying declarations, it must appear that Mable Hitz was pregnant in April, 1918, and that an abortion or miscarriage was then produced by defendant as alleged in the indictment. The evidence submitted at the trial did not warrant the jury in finding defendant guilty of the crime charged against her.''

Respondent contends that even if the dying declaration must be corroborated as to the fact that an abortion has taken place there is sufficient corroboration in the testimony of Dr. McCauley. We do not think so. He testified that her blood stream was infected and from his testimony it might be gathered that the primary cause of the infection was a puncture of the vaginal wall. He spoke of a hole in said wall that appeared to have existed ''a long time,'' how long not shown. An abscess had formed. How long it would take for an abscess such as he described to form and grow to the size he found it to be is not shown. Even if it could be inferred from the fact of such puncture that it had been made in an effort to produce an abortion *and* that deceased was then pregnant, *when* was it made and by whom? In this connection we call attention to the statement of deceased in her dying declaration that when the first alleged operation was performed by defendant *her womb* was dilated with an in-

strument and on the second occasion *her womb* was scraped out with an instrument and that she "was not put to sleep for either one of these procedures and *was well able and did witness what transpired both times.*" (Italics ours.) She ·made no mention of any pain or suffering or probing or disturbance of the *vaginal wall*. If the vaginal wall is of the thickness and texture as described by Dr. McCauley, and if (regarding which there is no evidence) it is sensitive to pain, it would seem that the forcing through it of a blunt instrument, so · as to rupture it, would have produced some sensation which would have been noticed by the patient. She made no mention of any such feeling or sensation, but stated only that *her womb* had been dilated and later "scraped out." Dr. McCauley gave no testimony indicating that in his opinion an operation such as that described by deceased in her dying declaration could have produced the conditions he found which in his opinion caused death, nor did he attempt to give an opinion as to whether or not deceased was pregnant when whatever operation, if any, was performed upon her. Verdicts of guilty cannot be based upon speculation and conjecture nor upon mere suspicion.

██ Appellant complains that the dying declaration should not have been admitted in evidence. The only objection made to its admission was that no proper foundation had been laid for its introduction and that "it would be her conclusion." We think a sufficient foundation was laid and while portions of it may be in the nature of conclusions other portions were not. Defendant did not point out to the trial court what portions she objected to as conclusions. Her objection went to the declaration as a whole. Moreover the point is not sufficiently preserved in the motion for new trial to call for discussion. The same is true as to complaints regarding the instructions. What we have said above disposes of this appeal. If additional evidence cannot be produced on another trial defendant should be discharged. The judgment is reversed and the cause is remanded. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur.