**STATE of Missouri, Respondent/Cross–Appellant,**

v.

**REPRODUCTIVE HEALTH SERVICES OF PLANNED PARENTHOOD OF the ST. LOUIS REGION, INC. and Robert Crist, M.D., Appellants/Cross–Respondents.**

No. ED 79435.

Missouri Court of Appeals,
Eastern District,
Division Four.

Nov. 19, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 14, 2003.

Application for Transfer Denied
March 4, 2003.

Andrew Rothchild, Evan Z. Reid, St. Louis, MO, Jamie Lansford, Arthur A. Benson II, Kansas City, MO, Dara Klassel, Roger Evans, Eve C. Gartner, Planned Parenthood Federation of America, Inc., New York, NY, for appellants.

Jordan B. Cherrick, Jeffrey R. Fink, St. Louis, MO, for respondent.

Before SHERRI B. SULLIVAN, P.J., LAWRENCE G. CRAHAN, J., and LAWRENCE E. MOONEY, J.

PER CURIAM.

Reproductive Health Services of Planned Parenthood of the St. Louis Region and Dr. Robert Crist, M.D. (collectively "RHS") appeal and the State of Mis-

souri cross-appeals various aspects of the declaratory judgment entered in the State's action seeking construction of the Missouri Infant's Protection Act (the "Act"), section 565.300 RSMo 2000.[1] RHS asserts the trial court erred in construing the Act to contain an exemption from liability for prohibited acts undertaken to preserve the health of the mother. RHS and the State both appeal paragraph (6) of the judgment on the ground that it is inconsistent with legislative intent as construed by the court elsewhere in its memorandum. The State also seeks additional declaratory relief. We reverse and strike paragraph (7) judgment construing the Act to contain an exemption from liability for prohibited acts undertaken to preserve the health of the mother. We modify paragraph (6) of the judgment. As so modified, we affirm the judgment in all other respects.

 The standard of review for a declaratory judgment is the same as that established in *Murphy v. Carron*, 536 S.W.2d 30 (Mo.1976), for court-tried cases. *Laclede County v. Douglass*, 43 S.W.3d 826, 827 (Mo. banc 2001). The judgment of the trial court will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32. However, construction of a statute is purely a matter of law, which must be reviewed *de novo*. *Martinez v. State*, 24 S.W.3d 10, 15 (Mo.App.2000).

The Missouri General Assembly passed the Act in 1999. The Governor vetoed the bill. However, the Act became law after the General Assembly overrode the veto on September 16, 1999. The Act provides:

1. This section shall be known and may be cited as the "Infant's Protection Act".

2. As used in this section, and only in this section, the following terms shall mean:

(1) "Born", complete separation of an intact child from the mother regardless of whether the umbilical cord is cut or the placenta detached;

(2) "Living infant", a human child, born or partially born, who is alive, as determined in accordance with the usual and customary standards of medical practice and is not dead as determined pursuant to section 194.005, RSMo, relating to the determination of the occurrence of death, and has not attained the age of thirty days post birth;

(3) "Partially born", partial separation of a child from the mother with the child's head intact with the torso. If vaginally delivered, a child is partially separated from the mother when the head in a cephalic presentation, or any part of the torso above the navel in a breech presentation, is outside the mother's external cervical os. If delivered abdominally, a child is partially separated from the mother when the child's head in a cephalic presentation, or any part of the torso above the navel in a breech presentation, is outside the mother's external abdominal wall.

3. A person is guilty of the crime of infanticide if such person causes the death of a living infant with the purpose to cause said death by an overt act performed when the infant is partially born or born.

4. The crime of infanticide shall be a class A felony.

5. A physician using procedures consistent with the usual and customary

---

1. All further statutory references are to RSMo 2000 unless otherwise indicated.

standards of medical practice to save the life of the mother during pregnancy or birth or to save the life of any unborn or partially born child of the same pregnancy shall not be criminally responsible under this section. In no event shall the mother be criminally responsible pursuant to this section for the acts of the physician if the physician is not held criminally responsible pursuant to this section.

6. This section shall not apply to any person who performs or attempts to perform a legal abortion if the act that causes the death is performed prior to the child being partially born, even though the death of the child occurs as a result of the abortion after the child is partially born.

7. Only that person who performs the overt act required under subsection 3 of this section shall be culpable under this section, unless a person, with the purpose of committing infanticide, does any act which is a substantial step towards the commission of the offense which results in the death of the living infant. A "substantial step" is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.

8. Nothing in this section shall be interpreted to exclude the defenses otherwise available to any person under the law including defenses provided pursuant to chapters 562 and 563, RSMo. Section 565.300.

The day after the General Assembly overrode the Governor's veto, RHS brought suit in the United States District Court for the Western District of Missouri seeking injunctive relief against enforcement of the Act. The district court entered a temporary restraining order enjoining the Act and later extended the order until it made a final disposition and order on RHS's request for a preliminary and permanent injunction. The trial was scheduled for March 2000.

On January 5, 2000, the State filed a petition for declaratory relief against RHS in the Circuit Court for the City of St. Louis. The next day, the State filed a motion in the district court to stay the federal litigation under *Railroad Comm'n of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), until the present case was adjudicated. The district court denied the State's motion and issued an injunction enjoining the parties from proceeding in the litigation in the circuit court. The State appealed the district court's order and injunction to the United States Court of Appeals for the Eighth Circuit. In March 2000, the Eighth Circuit stayed all proceedings in the federal district court and allowed the state litigation to go forward.

After the Eighth Circuit's ruling, the State filed its First Amended Petition for Declaratory Judgment seeking to have the circuit court declare the scope and meaning of the Act (Count I) and also sought to have the Act declared valid under the Missouri Constitution (Count II). RHS moved to stay all proceedings pending the United States Supreme Court's decision in *Stenberg v. Carhart*, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000), moved to dismiss part of Count I and all of Count II, and moved for judgment on the pleadings as to the remainder of Count I. The circuit court dismissed Count II for lack of a case or controversy, but denied the remainder of RHS's motions. Therefore, Count I is the only count in the State's petition at issue in this court. Count I requested the following relief:

WHEREFORE, Plaintiff the State of Missouri requests the Court enter judgment in its favor and against Defendants Reproductive Health Services of

Planned Parenthood of the St. Louis Region, Inc., and Robert Crist, M.D.:

A. declaring that the Act applies when a physician performs an abortion only if: (1) he performs an act that kills a living infant after the infant has been partially born; (2) he intentionally performs that killing act after the infant has been partially born; (3) he formed the intent to perform that killing act before the infant was partially born; and (4) the killing act is not necessary to save the life of the mother;

B. declaring that the Act does not prohibit the standard, traditional abortion procedures—suction curettage, dilation and evacuation (D & E), induction, and hysterotomy;

C. declaring that the Act bans the dilation and extraction (D & X) abortion procedure, also known as the intact dilation and evacuation (intact D & E) or intact D & X abortion procedure, if the infant is intact and living when she is partially born and the abortion is not necessary to save the life of the mother;

D. declaring that the term "living infant" in the Act means a born or partially born child with circulation and/or respiration;

E. declaring that the term "overt act" in the Act means an independent act performed entirely after a living infant is partially born;

F. declaring that the only effect of subsection 7 of the Act is to impose accomplice liability on a person who intentionally helps another person to commit infanticide;

G. assessing all costs against Defendants; and

H. granting all other appropriate relief.

The trial took place over four days, May 24–25, June 5 and August 17, 2000. On June 28, 2000, the United States Supreme Court handed down its decision in *Stenberg*. *Stenberg* held that banning the D & E procedure creates an undue burden upon a woman's right to make an abortion decision and is thus unconstitutional, and that a statute which bans the D & X procedure must contain an exception where it is necessary to preserve the life or health of the mother. 530 U.S. at 937, 945–46, 120 S.Ct. 2597. After completion of the trial, RHS moved to dismiss the case as moot. RHS argued that *Stenberg* rendered the Act unconstitutional because of its lack of a health exception and any declaration construing the Act, including deciding which abortions it prohibited and which it did not, would amount to a mere advisory opinion about a statute that could never take effect. For the first time, the State argued that the Act could be construed to contain an exception to protect the woman's health. In December 2000, the circuit court issued its judgment, denying RHS's motion to dismiss and entering judgment in favor of the State declaring the meaning of each provision of the Act.

The circuit court made the following factual findings about the manner in which physicians perform various abortion procedures. The circuit court found that the suction curettage procedure, or "vacuum aspiration," is the principal method of abortion during the first trimester of pregnancy. This procedure entails suctioning out the contents of the uterus by means of a tube or cannula that is attached to a suction machine past the woman's cervix into her uterus. Insertion of the cannula and the application of suction are usually sufficient to cause immediate fetal death. However, on occasion, the fetus will jam the suction cannula and the physician must use instruments to crush or fragment the fetus to complete the procedure.

The non-intact D & E procedure is the primary method of abortion during the second trimester of pregnancy. During this procedure, the physician dilates the woman's cervix by means of osmotic dilators and dismembers and evacuates the fetus *in utero* by means of forceps.

The intact D & E procedure entails extracting the fetus as far as possible through the cervix with as little dismemberment *in utero* as possible. The physician then collapses the calvarium, or fetal skull, by means of instruments and completes the evacuation of the uterus.

The intact D & E also has a variant, the D & X procedure. The physician dilates the cervix to the maximum extent possible, usually by inserting laminaria over several days, and then manipulates the fetus to a "footlong breech" position, with the feet down toward the cervix. The fetus is then extracted, usually by forceps, without dismemberment, to the point at which the fetal head is at the internal cervical os, whereupon the base of the skull is pierced and the contents of the calvarium are suctioned out. This causes the collapse of the skull and permits the complete removal of the fetus from the woman.

Other procedures are medical induction, hysterotomy and hysterectomy. Induction is a procedure performed during the second and third trimester in which labor is induced so that the uterus contracts and expels the fetus in the same manner as a delivery of an infant at term. Hysterotomy is the equivalent of a caesarian section for delivering a term infant and hysterectomy entails the complete removal of the uterus, including its contents.

The circuit court found that a D & E procedure, whether intact or non-intact, can exhibit many of the same features as a D & X procedure. Thus, at times a non-intact D & E can turn into an intact D & E because there is enough cervical dilation that a pass of the forceps causes most of the fetus to emerge beyond the cervix, necessitating skull compression to complete the procedure. In other cases, an intact D & E can turn into a dismemberment or a non-intact D & E because the physician encounters resistance such that the fetus cannot be removed largely intact but instead disarticulates as it is grasped by the forceps. However, neither an intact or non-intact D & E ever employs the extensive cervical dilation by laminaria or the manipulation of the fetus to convert it to a footlong breech position *in utero* prior to commencement of the procedure. Essentially, the physician's plan in a D & X procedure is always to deliver the fetus to the point of the after-coming head, and then collapse the head by suction.

The circuit court, in construing subsection 3 of the Act together with subsection 6, concluded that the Act can apply to an abortion only if the physician's plan in carrying out the abortion involves a separate, discrete act performed at or after partial birth of the infant that causes the infant's death. Therefore, the court concluded that the Act does not prohibit suction curettage, D & E, induction, hysterotomy, and hysterectomy because these procedures do not entail a plan by the physician to cause fetal death by a specific, discrete act performed at or after partial birth. However, the court concluded that the Act can apply to intact D & E and D & X procedures because they entail a plan by the physician to cause fetal death by a specific, discrete act performed at or after partial birth. Finally, the court concluded that subsection 8 of the Act provides a "catch-all" defense that incorporates a medical necessity defense.

The State argues that this court lacks jurisdiction because RHS's appeal was untimely. The record reflects that the circuit court entered a final judgment on

December 5, 2000. Therefore, unless RHS filed a timely after-trial motion, the judgment became final at the expiration of thirty days, January 4, 2001. Rule 81.05(a)(1). RHS would then have ten days in which to file a notice of appeal. Rule 81.04(a). However, on January 3, 2001, RHS filed a motion to amend the judgment. The circuit court never ruled on the motion. Therefore, the judgment became final ninety days after the after-trial motion was filed, on April 3, 2001. Rule 81.05(a)(2). RHS filed its notice of appeal on April 13, 2001, within ten days after the judgment became final.

However, the State argues that Rule 44.01(d) requires RHS to notice its motion for hearing or otherwise notify the trial court of its motion. The State claims because RHS failed to do so, they waived or abandoned their motion, thus resulting in a motion that was not properly filed. Therefore, the State argues that this court lacks jurisdiction because the judgment became final on January 4, 2001, rendering RHS's notice of appeal, filed on April 13, 2001, untimely.

█ We disagree with the State's analysis. Rule 81.05 mandates that a judgment becomes final at the expiration of thirty days after its entry unless an authorized after-trial motion is filed. The rule then states that if the after-trial motion is filed, the judgment becomes final ninety days after the motion is filed, at which time the motion is deemed overruled. Rule 81.05(a)(2)(A). As RHS points out, the rule does not condition the postponement of the finality of the judgment on a party following any particular procedure. Rule 44.01(d) only requires that "[a] written mo-

tion, other than one which may be heard ex parte, and notice of the hearing thereof shall be served not later than five days before the time specified for the hearing. . . ." This rule concerns service on the opposing party, not the court. The cases that the State cites are inapposite. RHS's appeal was timely filed.

In its first point, RHS asserts the trial court erred in construing subsection 8 of the Act to contain an exception to the statutory ban to protect the life and health of the woman.[2] Subsection 8 of the Act provides "nothing in this section shall be interpreted to exclude the defenses otherwise available to any person under the law including defenses provided pursuant to chapters 562 and 563 RSMo."

█ The primary rule of statutory construction is that we are to determine the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning. *Lonergan v. May*, 53 S.W.3d 122, 126 (Mo.App.2001). The plain meaning of words is their meaning "found in the dictionary . . . unless the legislature provides a different definition." *Lincoln Indus., Inc. v. Director of Revenue*, 51 S.W.3d 462, 465 (Mo. banc 2001). Missouri courts do not have the authority to read into a statute a legislative intent that is contrary to its plain and ordinary meaning. *State v. Rowe*, 63 S.W.3d 647, 650 (Mo. banc 2002). Indeed, in *Rowe* the Missouri Supreme Court interpreted the statute at issue in accordance with the plain meaning of the words used by the legislature despite the fact that it was unlikely that the result was what the legislature intended.

---

**2.** Paragraph (7) of the judgment declares: "by virtue of the provisions of [section] 565.300.8, [section] 565.300 does not apply to the performance, by a licensed physician, including defendant Crist, of any abortion nec-

essary, in appropriate medical judgment, to preserve the life or health of the mother, without limitation as to physical or mental health, regardless of the type of abortion undertaken[.]"

■ RHS points out that subsection 5 of the Act contains a specific exemption for procedures used to save the life of the mother or the life of any unborn or partially born child. Invoking the interpretative principle *expressio unius est exclusio altarius* (the expression of one thing is the exclusion of another), RHS reasons that by including an express but extremely narrow exception to preserve the life of the mother or child, the legislature necessarily meant to exclude a broader exemption to preserve the health of the mother. As a general rule, when statutory exceptions are plainly expressed, Missouri courts will not add exceptions or exclusions beyond those explicitly provided by the legislature. *See, e.g., Groh v. Ballard,* 965 S.W.2d 872, 874 (Mo.App.1998)(refusing to add to list of statutory reasons for voiding beneficial deed); *State v. Williams,* 24 S.W.3d 101, 117 (Mo.App.2000) (refusing to add exceptions to the felony murder statute beyond those stated by the legislature.)

■ RHS further points out that the legislature has elsewhere been fully capable of clearly articulating an exception based on the health of the woman when that is its intent. Section 188.030 provides, in pertinent part: "No abortion of a viable unborn child shall be performed unless necessary to preserve the life *or health* of the woman." (emphasis added).

RHS further asserts that the legislature's intent to create only a narrow life exception is evidenced by its repeated rejection of amendments to the act that would have allowed health exceptions. Journal of the House, March 3, 1999 (rejecting an amendment that would have exempted procedures to "prevent the occurrence of severe health consequences upon the mother...."), Journal of the

Senate, May 3, 1999 and May 4, 1999 (rejecting amendments that would have exempted procedures in cases of "medical emergency" or to "prevent any condition, which if left untreated, could progress to such a point that death or permanent injury could result...."). [3] Indeed, the absence of a health exception was specifically cited by the Governor in his veto message. Missouri Governor's office speeches, veto of H.B. 427 ("This abortion ban fails to include an exception for medical emergencies or for preserving the health of the mother. A health exception is both constitutionally and ethically essential.") Nevertheless, the legislature overrode the Governor's veto.

The State directs our attention to the phrase "defenses otherwise available to any person under the law" in subsection 8 of the Act, urging that, by use of the broad terms "defenses ... under the law" the legislature intended to incorporate all constitutional as well as statutory defenses to the crime of infanticide. Thus, the State asserts, given the holding in *Stenberg* that the federal constitution protects a physician from liability for performing a D & X abortion that is necessary, in appropriate medical judgment, to preserve the health of the mother, a physician charged with infanticide could therefore claim as a defense that the Act cannot be constitutionally applied to him because the procedure was necessary to preserve the health of the mother.

What the State overlooks is the fact that a defendant charged under the statute declared unconstitutional in *Stenberg* could have asserted precisely the same defense. The same would be true of any prosecution under a facially unconstitutional statute.

---

**3.** RHS acknowledges that the Senate amendments were offered to a bill never voted on as a whole but containing identical language

with respect to the life of the mother exception as the final Senate bill.

This is because, under the Supremacy Clause, neither Missouri nor Nebraska could deprive a defendant of federal constitutional defenses if they wanted to do so. Yet the fact that a defendant could, if prosecuted, assert that his conduct was constitutionally protected has never been a basis for upholding a law that is otherwise facially unconstitutional. If it were, no law would ever be declared facially unconstitutional.

Moreover, the State's argument ignores the fact that *Stenberg* was decided long after the Act was passed. Under the State's reasoning, had *Stenberg* been decided the other way, there would be no "health of the mother" defense. In interpreting the Act, however, we look to the language of the statute to discern, if possible, the intent of the legislature at the time the statute was enacted. By its reliance on *Stenberg*, the State implicitly concedes that no health exception can be found within the plain language of the statute.

The State further argues that the legislature's intent to incorporate any constitutional limitations can be found in section 188.010, which declares the legislature's intention "to regulate abortion to the full extent permitted by the Constitution of the United States, decisions of the United States Supreme Court, and federal statutes." In the State's view, the defenses available under the Act would thus evolve to incorporate future changes in federal precedent and statutes.[4] If this was the legislature's intent, it is not a permissible one because it leaves the statute itself insufficiently clear "to give reasonable notice of the prohibited conduct and to apprise enforcers of the proper standards for enforcement." *State v. Young*, 695 S.W.2d 882, 886 (Mo. banc 1985). As RHS points out, if the State's interpretation of subsection 8 were correct, the State could simply criminalize all abortions except those protected by the United States Constitution, leaving to the courts the task of determining what is permitted and what is not. This would impermissibly delegate to the courts the task of statutory revision, a matter within the exclusive province of the General Assembly. *Id.* As the Missouri Supreme Court observed in *Young* (quoting *Papachristou v. City of Jacksonville*, 405 U.S. 156, 165, 92 S.Ct. 839, 845, 31 L.Ed.2d 110 (1972)): "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained and who should be set at large' *United States v. Reese*, 92 U.S. 214, 221, 2 Otto 214, 23 L.Ed. 563, 566 (1876)." *Young*, 695 S.W.2d at 886.

In summary, we find nothing in either the language of the Act or its limited legislative history that supports the view that the Act provides an exception to liability for actions undertaken to preserve the

---

4. The State draws an analogy to federal statutes imposing criminal penalties for depriving individuals of their constitutional rights. *See, e.g.,* 18 U.S.C. Sections 241, 242. In the State's view, if it is constitutionally permissible for federal statutes to define the elements of a crime by incorporating federal constitutional law, it is equally permissible for the Act to incorporate evolving federal constitutional law as a defense. We disagree. The statutes cited by the State have been construed to apply only to violations of federal constitutional rights that have been clearly established by judicial decisions at the time of the conduct at issue. *United States v. Lanier*, 520 U.S. 259, 266–67, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). Thus, they present no danger of chilling constitutionally protected conduct. In contrast, incorporating evolving federal constitutional law as a defense presents a clear danger that individuals will refrain from constitutionally protected conduct until its legality is clearly established by judicial decision.

health of the mother.[5] Accordingly, the trial court's findings with respect to subsection 8 of the Act are reversed and paragraph (7) is hereby ordered stricken from the judgment.

RHS in its second point and the State in its fourth point agree that there is a conflict between paragraph (6) of the judgment and the trial court's discussion of legislative intent elsewhere in its memorandum. Paragraph (6) of the judgment provides:

> (6) Section 565.300 can apply to an intact dilation (dilatation) and evacuation abortion procedure (intact D & E), including the procedure known as an intact dilation (dilatation) and extraction abortion procedure (D & X), performed by a licensed physician, including defendant Crist, if and only if the physician *intends* to perform and in fact *intentionally* performs the following acts: (a) serial administration of osmotic dilators (laminaria) over a period exceeding 24 hours; (b) manipulation of the position of the fetus *in utero* to ensure a footlong breech delivery; (c) partial or complete separation of a living fetus from the mother with the child's head intact with the torso if vaginally delivered, a fetus is partially separated from the mother when the head in a cephalic presentation, or any part of the torso above the navel in a breech presentation, is outside the mother's external cervical os; if delivered abdominally, a fetus is partially separated from the mother when the child's head in cephalic presentation, or any part of the torso above the navel in a breech presentation, is outside the mother's external abdominal wall; and (d) intentional physical application of force, either by instrument or suction, to the body of the fetus itself, for the purpose of causing, and actually causing, cessation of circulation or respiration or both at or after complete or partial separation (as defined herein) of the living fetus from the mother; provided, that nothing in this judgment shall be construed as declaring that any person performing the acts described in this paragraph (6) of this judgment is necessarily guilty of the crime of infanticide.

(emphasis added). In its memorandum, the circuit court notes several times that the physician must have a "plan" to extract the fetus intact and then perform a discrete overt act causing the death of the fetus. The court then noted that a physician performing a D & X procedure could be liable under the statute, but that conviction would depend on whether the State could prove beyond a reasonable doubt that the actor performed the overt act on the body of the fetus with the purpose of causing fetal death by that act.

 Where there is a conflict within the text of a court order, the portion of the order wherein the court gives its imprima-

---

5. RHS also challenges the trial court's determination that subsection 8 also incorporates an additional life of the mother exception in addition to the express exception in subsection 5. RHS complains that this could lead to confusion over whether an objective or subjective standard applies. Although we do not sustain the trial court's reasoning on this issue, it is clear that subsection 8 does expressly incorporate Chapters 562 and 563, which includes the defense of justification. Section 563.026.1. Prior Missouri cases have recognized that the fact that the procedure was undertaken to preserve the life of the mother is a defense to the crime of abortion. *State v. Smith*, 344 Mo. 1129, 130 S.W.2d 550 (1939); *State v. Sonner*, 253 Mo. 440, 161 S.W. 723 (1913). Subsection 8 therefore incorporates this recognized defense. To the extent the precise contours of the defense may arguably be different from the express defense in subsection 5, this cannot possibly be prejudicial to any potential defendant because it would simply provide an additional available defense.

tur or exercises its power trumps inconsistent language appearing elsewhere in the order. *Jacobs v. Georgiou,* 922 S.W.2d 765, 770 (Mo.App.1996). However, Rule 84.14 permits us to give such judgment as the trial court ought to have given. *Miller–Stauch Construction Co. v. Williams–Bungart Electric, Inc.,* 959 S.W.2d 490, 497 (Mo.App.1998). As both parties agree that paragraph (6) of the judgment should be clarified by adding the word "plan" and substituting the phrase "has the purpose" for the word "intends" and the word "purposely" for the word "intentionally," we will modify the judgment accordingly.

 RHS also wishes to add the phrase "prior to performing the abortion" between the phrase "if and only if" and "the physician." The State objects to this, however, and urges this court to add the phrase "before complete or partial separation (as defined herein) of the living fetus from the mother with the child's head intact with the torso" in lieu of "prior to performing the abortion." The State claims this language reflects the General Assembly's intent to ban all D & X procedures, subject to the exception to save the woman's life, if the plan to perform the abortion is formed before or after the abortion is begun. RHS claims that in a D & E abortion, a physician may perform all four acts delineated in paragraph (6), and depending on the clinical situation, the plan to perform all these steps may occur before the point of "partial birth." In its memorandum, the trial court made the following findings with respect to the necessary intent:

In the Court's view, the *mens rea* requirement of the Infant's Protection Act prevent its application to the "intact" D & E procedure as described in the record, for the simple reason that the physician's plan is merely to remove the fetus in as intact a state as possible

and not to ensure that the fetus will emerge intact (i.e. with head joined to torso) to the point where skull compression or aspiration will be essential or unavoidable. In other words, the physician's plan in an "intact" D & E can be, and usually is, to employ dismemberment techniques with a minimum of dismemberment, but without such advance preparation of the cervix or manipulation of the fetus as will assure that the fetus can be removed to the point of the aftercoming head, compelling crushing or collapsing the calvarium. Of course, to the extent that the physician's plan in a particular "intact" D & E is in fact to ensure that the fetus is extracted intact so that its skull can be crushed or aspirated, the physician could be liable under the Act.

The trial court further found, contrary to RHS's claims, that neither the non-intact nor intact D & E procedures ever employs the extensive cervical dilation by laminaria or the manipulation of the fetus to convert it to a footlong breech position *in utero* prior to commencement of the procedure. These findings compel the conclusion that the trial court found, correctly in our view, that the culpable mens rea of the physician must begin before he begins to perform the procedure, rather than during the procedure at any time before the fetus is born or partially born. Therefore, paragraph (6) shall be modified, in relevant part, as follows: "if and only if, prior to performing the abortion the physician plans and has a purpose to perform and in fact purposefully performs the following acts...."

Finally, RHS wishes to add the following sentence to the end of paragraph (6): Section 565.300.3 does not apply to the performance by a licensed physician, including Dr. Crist, of any intact D & E abortion where the physician's plan is to remove the fetus in as intact a state as

possible but without such advance preparation of the cervix or manipulation of the fetus as will assure that the fetus will be removed to the point of the after-coming head, compelling crushing or collapsing the calvarium.

We will not add this sentence as paragraph (6) of the judgment clearly denominates, in conjunctive form, four elements that the State must prove. Two of these elements are serial administration of osmotic dilators over a period exceeding 24 hours (advance preparation of the cervix) and manipulation of the position of the fetus *in utero* to ensure a footlong delivery. Therefore, the modification requested by RHS is not necessary.

The State's first contention in its cross-appeal is that the circuit court erred in omitting from paragraph (7) of the judgment language stating that subsection 8 of the Act incorporates federal constitutional law on abortion as a defense to the Act and that the scope of the constitutional defense under subsection 8 evolves as federal constitutional law on abortion evolves. Our discussion of RHS's first point resolves this issue adversely to the State. Point denied.

The State's second contention is that the circuit court erred in omitting from paragraph (7) of the judgment language stating that the State bears the burden of persuasion as to the lack of medical necessity of an abortion proscribed by subsection 3 of the Act once the physician has properly injected a medical necessity defense under subsection 8 of the Act. We have stricken paragraph (7) of the judgment in response to RHS's first point. This contention is therefore moot.

The judgment is affirmed as modified.

LAWRENCE G. CRAHAN, Judge, concurring.

I concur fully in the per curiam opinion of the court. The opinion quite properly does not address the constitutionality of the Act. That issue will be determined by the federal district court when this case is finally resolved. The briefs of both parties, however, reflect the implicit assumption that the absence of a health exception will render the Act unconstitutional under *Stenberg v. Carhart,* 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). I write separately to explain why *Stenberg* is based on an implicit assumption that the record in this case at least suggests may not be true.

*Stenberg* struck down a Nebraska statute that the court found banned both the rarely-performed D & X procedure and the more commonly performed D & E procedure. *Id.* at 938, 120 S.Ct. 2597. The trial court in this case found and the parties do not dispute that Missouri's Act "does not apply to the performance, by a licensed physician, ... of a dismemberment or "nonintact" dilation (dilatation) and evacuation (D & E) abortion."

The Supreme Court further held that Nebraska had failed to demonstrate that banning the D & X procedure without a health exception may not create significant health risks for women because the record before it showed that significant medical authority supports the proposition that in some circumstances, D & X would be the safest procedure. *Id.* at 932, 120 S.Ct. 2597.[1] Curiously, however, after enumerating these perceived benefits of intact

---

1. Citing the findings of the district court, the advantages of the D & X procedure were identified as (1) it permits the fetus to pass through the cervix with a minimum of instrumentation; (2) it reduces operating time, blood loss and risk of infection; (3) it reduces complications from bony fragments; (4) it reduces instrument inflicted damage to the uterus and cervix; (5) it prevents the most common causes of maternal mortality (DIC

extraction of the fetus, the Court never addresses the more fundamental question presented by Missouri's (and arguably Nebraska's) Act: Why is it necessary or desirable to perform the procedure on a fetus that is still alive? Or, to state the issue in constitutional terms: What, if any, risk is presented to the health of the mother by requiring her physician to take steps to humanely bring about the demise of the fetus before undertaking intact extraction from the uterus? By failing to discuss this issue, the *Stenberg* opinion at least implicitly assumes either that there is some medical benefit to the fetus being alive during extraction from the uterus or that taking steps to humanely cause the demise of the fetus before extraction would pose some appreciable additional health risk to the mother. It is not at all clear, however, that the Court had any factual basis for either assumption.

The trial court expressly found and the parties do not dispute that Missouri's Act "does not apply to the performance, by a licensed physician, ... of any abortion prior to the time that a fetal heartbeat is detectable, nor does it apply to an abortion at any time when the fetus has no detectable heartbeat." Thus, Missouri's Act clearly permits intact extraction of a fetus from the uterus, with all of its perceived benefits identified by the Supreme Court in *Stenberg*. It merely requires that the physician take steps to humanely bring about the demise of the fetus before performing the procedure.

We have no record of the debates leading up to the enactment of Missouri's Act and thus do not know for certain what precise concerns led to its enactment. However, Dr. Cook's testimony at the trial of this case identifies one of the more likely concerns. Dr. Cook testified that in

his opinion, the D & X procedure was needlessly cruel because the infant was still alive and capable of feeling pain. The basis for Dr. Cook's opinion that the fetus can suffer pain as a result of the D & X procedure was not explored further because it was not the focus of the proceeding below. Whether a fetus can, in fact, experience pain is apparently a matter of some dispute. In *Women's Medical Professional Corp. v. Voinovich,* 911 F.Supp. 1051, 1072–74 (S.D.Ohio 1995), the court recounted testimony by two neurosurgeons who generally agreed that a fetus at the age of twenty to twenty-four weeks will react to noxious stimuli, but neither could state with certainty that the fetus experiences a conscious awareness of pain. It is indeed difficult to imagine how this could ever be conclusively established. But if there is uncertainty as to whether the fetus can experience pain as a result of the D & X procedure (or, for that matter the non-intact D & E, which involves actual dismemberment of the fetus), must a State sit. idly by and tolerate potential cruelty when there are humane alternatives that may pose no appreciable additional risk to the mother's health?

In *Stenberg,* the Supreme Court somewhat cryptically made reference to an AMS report which states that, after twenty weeks, "[s]ome physicians use intrafetal potassium chloride or digoxin to induce fetal demise prior to a late D & E (after twenty weeks), to facilitate evacuation." 530 U.S. at 924, 120 S.Ct. 2597 (citing American Medical Association, Report of Board of Trustees on Late–Term Abortion, pp. 491–92). Although it was not the focus of the hearing below, Dr. Crist's and Dr. Stubblefield's testimony both suggest that cutting the umbilical cord would also bring about fetal demise, thus ensuring the fetus

and amniotic fluid embolus); and (6) it eliminates the possibility of "horrible complica-

tions" arising from retained fetal parts. *Id.*

would not experience pain during the process of extraction from the uterus. Dr. Stubblefield also testified that all abortions performed after seventeen weeks at Boston Medical Center, where he chairs the department of obstetrician and gynecology, are done by labor induction and only after the introduction of a saline solution into the amniotic sac, which causes the demise of the fetus.

I cite this testimony because it at least suggests that there are safe and humane measures that can be employed by a physician without appreciable additional health risks to the mother that will cause the painless demise of the fetus prior to extraction from the uterus. I readily acknowledge that this was not the subject or focus of the hearing below and that there may well be other considerations not explored in the limited record before us. I do respectfully submit, however, that a complete examination of this subject is both necessary and appropriate in any proceeding to determine the constitutionality of Missouri's Act.