

# SUPREME COURT OF MISSOURI
## en banc

ANGELA ANDERSON, )
)
Appellant, )
)
v. ) No. SC94372
)
UNION ELECTRIC COMPANY, )
)
Respondent. )

APPEAL FROM THE CIRCUIT COURT OF MORGAN COUNTY
The Honorable Kenneth Michael Hayden, Judge

*Opinion issued June 16, 2015*

Angela Anderson ("Anderson") sued Union Electric Company ("UE") for

wrongful death after her two children drowned in the Lake of the Ozarks. The trial court

dismissed the petition on the ground that UE is immune from Anderson's claims under

the Recreational Use Act, §§ 537.345 to 537.348, RSMo 2000 and Supp. 2013

(the "RUA"). This judgment is affirmed.

### Background

The Lake of the Ozarks (the "Lake") is the impoundment created by Bagnell Dam,

and both the Lake and the dam are owned by UE. The Lake extends more than 90 miles

up the Osage River riverbed. It has a surface area of more than 55,000 acres and a

shoreline of more than 1,100 miles. Even though UE constructed Bagnell Dam to

generate hydroelectric current for its customers, thousands of area landowners and millions of visitors each year enjoy the Lake's scenic beauty and recreational allure.

Anderson alleges that UE does not allow those who own land along the Lake's shore to build, maintain, or use docks or other improvements extending onto or over the Lake unless they obtain a permit from UE. According to Anderson, this permit program allows UE to impose and enforce various requirements for these improvements, including requirements regulating the manner in which landowners may supply electricity to their docks. In connection with the issuance and enforcement of these permits, Anderson alleges that UE charges various fees, including a "use fee."

Anderson and her husband own real estate adjoining the Lake. She alleges that the property "was serviced by a lakeside dock" and that the "placement, maintenance and use [of Anderson's dock] was the subject of fees charged by and paid to" UE. The Andersons chose to supply electric power to their dock but failed to protect that supply with ground fault interrupt ("GFI") devices at or above the seawall to prevent injury in the event of an electrical fault. Anderson alleges that, prior to the death of her children, UE did not warn dock owners about the risks of not using such GFI devices or require dock owners to install these devices as a condition of obtaining a dock permit.[1]

On July 4, 2012, Anderson alleges that her children were "swimming in the vicinity of the Anderson Dock when they encountered stray electrical current." She

---

[1] Anderson also alleges that – after UE issued permits for a large marina and restaurant in the same area of the Lake as Anderson's dock – UE failed to warn Anderson and other dock owners that traffic to and from this new establishment would increase the wear and tear on surrounding docks.

alleges that this "stray current" caused the children's death from drowning, electrocution, or both. In addition, Anderson alleges UE was negligent in one or more of the following respects:

- UE failed to "adequately inspect the Anderson dock to ensure adequate ground fault interrupter protection;"

- UE failed to include ground fault interrupter protective devices at or above the seawall as a precondition to dock permitting;

- UE failed to warn dock owners "including Brian and Angela Anderson, of the need for ground fault interrupter protective devices at or above the dock seawalls;" and

- UE failed to warn dock owners along the Gravois arm of anticipated increase in wear and tear on docks as a consequence of the permitting of the [nearby] restaurant property.

In conclusion, Anderson alleges that – as a "direct and proximate" result of one or more of the foregoing negligent acts or omissions – "stray current was caused to enter the water in the vicinity of the Anderson dock," killing Anderson's children.[2]

---

[2] After her petition was dismissed, Anderson sought leave to amend to add the following allegations: "[The children's] entry to the Defendant's property was made, by and through and upon the aforementioned dock. Said dock was subject to fees as further described herein." The trial court overruled this motion, and Anderson claims this, too, was reversible error. In her brief, however, Anderson argues that this amendment was not necessary because the "new" allegations reasonably could be inferred from those in the original petition. *See* App. Br. at 20 ("the proposed amended petition sought to make these allegations more explicit"). Accordingly, for purposes of reviewing the trial court's dismissal, this Court will consider these allegations to be included in (or fairly inferred from) the allegations in Anderson's original petition. Not only does this render moot Anderson's claim that the trial court erred in overruling her motion to amend, the fact that these allegations add nothing material to the analysis or provide any basis on which to reverse the trial court's dismissal demonstrates the trial court also did not err in overruling Anderson's leave to amend. *See Rolwing v. Nestle Holdings, Inc.*, 437 S.W.3d 180, 184 (Mo. banc 2014) (trial court did not abuse its discretion by overruling plaintiff's motion to amend when amendment did not state facts material to the pertinent statutory defense).

3

UE moved to dismiss Anderson's petition under Rule 55.27(a)(6) on the ground that it is immune from such claims under the RUA. The circuit court agreed, finding: "Pursuant to R.S.Mo. §537.346, Ameren 'owes no duty of care to any person who enters on the land without charge to keep his land safe for recreational use or to give any general or specific warning with respect to any natural or artificial condition, structure, or personal property thereon.'" Anderson appealed the judgment dismissing her petition. Following an opinion in the court of appeals, this Court transferred the matter and assumed jurisdiction over the appeal. Mo. Const. art. V, § 10.

*Analysis*

When a petition is dismissed under Rule 55.27(a)(6) for failure to state a claim upon which relief may be granted, the standard of review is *de novo. Lynch v. Lynch,* 260 S.W.3d 834, 836 (Mo. banc 2008). The appellate court reviews the petition to determine if the facts alleged meet the elements of a recognized cause of action. *Foster v. State*, 352 S.W.3d 357, 359 (Mo. banc 2011). If the dismissal is justified on any ground alleged in the motion, however, the judgment will be affirmed. *Id.* Finally, when a landowner is entitled to immunity under the RUA, the trial court has no discretion and must dismiss the petition under Rule 55.27(a)(6). *State ex rel. Young v. Wood*, 254 S.W.3d 871, 872 (Mo. banc 2008).

UE's motion to dismiss is based solely on the RUA and the immunity provided in section 537.346. "The [RUA] creates tort immunity for landowners who open their land to the public free of charge for recreational use. The purpose of the act is to encourage the free use of land for recreational purposes in order to preserve and utilize our natural

4

resources." *Foster v. St. Louis County*, 239 S.W.3d 599 (Mo. banc 2007) (internal citations and quotation marks omitted). Section 537.346 provides:

> Except as provided in sections 537.345 to 537.348, and section 537.351, an owner of land[3] owes no duty of care to any person who enters on the land without charge to keep his land safe for recreational use or to give any general or specific warning with respect to any natural or artificial condition, structure, or personal property thereon.

Under this section, UE is immune from any claim that is: (a) premised on its status as the owner of the Lake; and (b) based on its alleged failure to keep the Lake safe for recreational use and/or its failure to warn recreational users of the risks associated with any natural or artificial condition, structure, or personal property on the Lake. *Young*, 254 S.W.3d at 873. Anderson does not contest that her claims are within the scope of this immunity under the RUA. First, her claims are premised solely on UE's status as the owner of the Lake, i.e., the "land" on (or in) which the children were killed. Second, the only acts of negligence alleged by Anderson are based on UE's failure to keep the Lake safe (i.e., free of "stray current") and/or UE's failure to warn Anderson or her children of the risks created by an artificial condition (i.e., that the absence of seawall GFI devices could result in "stray current" entering the Lake in the vicinity of Anderson's dock).

Instead of arguing that her claims are not within the scope of the immunity created by the RUA, Anderson argues that UE does not qualify for immunity under section 537.346 because her children did not "enter[] on the land without charge[.]" Anderson contends that the "use fee" she paid to UE for her dock permit constitutes a "charge"

---

3 "Land," as used in section 537.346, is defined as "all real property, land and water, and all structures, fixtures, equipment and machinery thereon." § 537.345(2).

5

within the meaning of section 537.346 and, therefore, UE is not entitled to immunity under the RUA. The Court rejects this argument.

The fees paid in connection with the Anderson's dock permit are not a "charge" as that word is used in section 537.346. Instead, "charge" is defined as:

> the *admission price or fee asked by an owner of land* or an invitation or permission without price or fee to use land for recreational purposes when such invitation or permission is given for the purpose of sales promotion, advertising or public goodwill in fostering business purposes.

§ 537.345(1) (emphasis added).[4]

In *Wilson v. United States*, 989 F.2d 953 (8th Cir. 1993), the Eighth Circuit held that immunity under Missouri's RUA applied even though the injured boy scout was required to pay a $2 fee to stay on Fort Leonard Wood property overnight. *Id*. at 957. The court held that this overnight fee was not a "charge" as defined in section 537.345(1) because it "was not charged to members of the public for entry on to the land or for use of the land." *Id.* (internal citation and quotation marks omitted). Instead, the court noted that the scouts "could have used Fort Leonard Wood without making this $2.00 payment if they had chosen not to stay overnight." *Id.* Accordingly, *Wilson* concludes that the "only way to avoid inconsistent application of the Act ... is to interpret the word 'charge' as *an actual admission price paid for permission to enter the land* at the time of its use for recreational purposes." *Id*. (quoting *Genco v. Connecticut Light and Power Co.,* 508 A.2d 58, 62 (Conn. 1986) (applying similarly worded recreational immunity act and

---

[4]  Anderson's claim focuses solely on the fees paid to UE in connection with her dock permit. She does not claim that UE's permission to use the Lake "is given for the purpose of sales promotion, advertising or public goodwill in fostering business purposes."

6

definitions)) (emphasis in *Wilson*). *See also Foster*, 239 S.W.3d at 601 (even though St. Louis County charged fees for the use of certain picnic facilities in the park, it did not charge anyone – including those intending to picnic – an "admission fee" to enter the park).

Here, Anderson does not allege that the fees she paid to UE in connection with her dock permit were an "admission fee" paid to obtain UE's permission to enter the Lake. Like the rest of the public, Anderson concedes that she and her children were free to enter the Lake as often as they wished without paying an "admission fee" to UE. The "use fee" Anderson paid to obtain a permit for the dock does not constitute a "charge" under section 537.346 because it is in no sense an "admission fee" as used in the definition of "charge" set out in section 537.345(1).

Anderson argues that the dock permit fees constitute a "charge" because the children entered the Lake from Anderson's dock. There is no basis in the statute, however, to hold that UE's immunity under the RUA turns on whether the children waded into the Lake from the shore next to the dock or jumped into the Lake from the dock. What matters is not where or how the children entered the Lake, but whether UE imposed a charge for that entry. The fees that Anderson paid for her dock permit were for the privilege of building and using the dock. The "charge" referred to in section 537.346, on the other hand, is only an "admission price or fee" for the privilege of entering and using the Lake. Because Anderson does not (and cannot) allege that UE charged her (or her children) an admission fee for entry into the Lake, UE is immune from Anderson's claims under the RUA and section 537.346.

7

Anticipating that the fees paid to UE for the dock permit were not a "charge" that would deprive UE of immunity under the RUA, Anderson also argues that her claims against UE may proceed pursuant to the exception in section 537.348(3)(d) to the broad RUA immunity in section 537.346. She argues that her dock is "noncovered land" under the exception in section 537.348(3)(d) because UE uses that portion of the Lake where her dock is located (and the other portions where other private docks are located) primarily for commercial purposes. The Court rejects this argument as well.

Even though a landowner qualifies for the immunity created in section 537.346, that landowner may still be liable for claims that fall within one of the exemptions in section 537.348. The exemption Anderson seeks to invoke is found in section 537.348(3)(d), which states: "Nothing in this act shall be construed to … limit liability that otherwise would be incurred by … owners of land for … (3) Injuries occurring on or in … (d) Any noncovered land." The term "noncovered land" means:

> any portion of any land, the surface of which portion is *actually used primarily for commercial, industrial, mining or manufacturing purposes*; provided, however, that use of any portion of any land primarily for agricultural, grazing, forestry, conservation, natural area, owner's recreation or similar or related uses or purposes shall not under any circumstances be deemed to be use of such portion for commercial, industrial, mining or manufacturing purposes.

§ 537.348(3)(d) (emphasis added).

According to Anderson, any portion of the Lake that is covered by a private dock (including the portion covered by Anderson's dock) is "noncovered land" because UE uses those portions primarily for commercial purposes. She insists that this commercial purpose results not from the fact that UE requires dock permits but from the fact that UE

8

charges fees for those permits.[5]  Anderson asserts the central logic of her claim in a single sentence:  "That a fee is a commercial transaction cannot credibly be questioned."  App. Br. at 15.  As with her claim that UE's permit fees constitute "charges," however, the analyses in *Foster* and *Wilson* defeat Anderson's "commercial purpose" argument.

In *Wilson*, the court rejected the argument that charging a fee unrelated to admission necessarily converts the owner's use of the land into a commercial enterprise. *Wilson*, 989 F.2d at 958.  As a result, the fact that the scouts paid a nightly fee to stay in the building where the decedent was killed did not mean the owner was using the building primarily for a commercial purpose.  *Id.*  In *Foster*, the plaintiff argued that St. Louis County used the park for a commercial purpose because – even though the County's picnic fee was not an admission "charge" – the mere fact that the County charged picnic and other fees necessarily meant the County's primary use of the park was for commercial purposes.  *Foster*, 239 S.W.3d at 602.  This Court rejected that argument, holding that section 537.348(3)(d) cannot apply as long as the injury occurs on a portion of the land "open to the public for recreational use free of charge."  *Id.* (noting that the "focus of the commercial purpose analysis is on the portion of the land on which the injury occurred").

Here, as in *Foster*, Anderson's children were killed while swimming in a portion of the Lake that was open to them (and the rest of the public) for recreational use free of

---

[5]  Anderson does not argue that UE uses the entire Lake for the commercial purpose of generating electricity.  *See Lonergan v. May*, 53 S.W.3d 122, 131 (Mo. App. 2001) (rejecting this argument as "absurd").  Instead, Anderson argues only that UE uses that portion of the Lake onto which private docks extend for the commercial purpose of generating dock permit fees.

9

charge. Even if the Court assumes that every private dock (including Anderson's) is "noncovered land" because UE uses those portions of the Lake primarily for commercial purposes, Anderson concedes her children were not on the dock when they were killed. Instead, the petition states the children were only "swimming in the vicinity of the Anderson Dock" when the accident occurred. As a result, Anderson's claims cannot proceed under the exception in section 537.348(3)(d) because Anderson's children's injuries did not occur on the "noncovered land." *Foster*, 239 S.W.3d at 602.

Anderson's argument assumes that if all the private docks on the Lake are "noncovered land" because UE uses them for commercial purposes, then all the water "in the vicinity" of those docks must also be "noncovered land." Even if this assumption (which Anderson neither explains nor even acknowledges) is correct, the exception in section 537.348(3)(d) still does not apply. *Wilson* holds that a landowner does not necessarily use the property primarily for commercial purposes under section 537.348(3)(d) merely because the owner charges fees for things other than admission. *Wilson*, 989 F.2d at 958. This Court agrees.

As noted above, the essence of Anderson's claim is her assertion that the act of charging a fee necessarily makes the transaction "commercial." This is incorrect. The act of charging a fee serves a "commercial" purpose only if the primary aim of those fees is to generate a profit or other business advantage. *See* Webster's Third New International Dictionary 456 (1966) ("commercial" means "from the point of view of profit: having profit as the primary aim"). Anderson does not allege that UE charged its

10

permit fees with profit as the primary aim.  Instead, she concedes that the permit fees are part of a program imposed for purposes are that are not primarily commercial.

As Anderson explains in her brief to this Court, the regulations of the Federal Energy Regulatory Commission (FERC) make UE responsible for developing the Lake's recreational resources.  App. Br. at 15 (citing *Coalition for Fair & Equitable Regulation of Docks on Lake of the Ozarks v. F.E.R.C.*, 297 F.3d 771, 775 (8th Cir. 2002)).  This responsibility is incorporated into – and expanded upon in – the terms of the FERC license allowing UE to own and operate the Lake and Bagnell Dam.  *Coalition* explains the scope of UE's responsibility:

> Article 41 of Union Electric's license for the Osage Project allows Union Electric to grant permission for certain uses of the project lands and waters without prior Commission approval, *if the use is "consistent with the purposes of protecting and enhancing the scenic, recreational, and other environmental values of the project."*

*Coalition*, 297 F.3d at 775 (emphasis added).

Under the terms of its FERC license, therefore, UE is authorized to implement a dock permitting program only if those permits are consistent – not with UE's commercial purposes – but with UE's purpose of "protecting and enhancing the scenic, recreational, and other environmental values of the project." If UE operated a permit program for some other purpose (e.g., for the commercial purpose of charging profitable fees), that program likely would not comply with the terms of UE's license.

*Coalition* further explains that UE's license expressly prohibits UE from subverting its purpose of protecting and enhancing the recreational value of the Lake to a commercial purpose such as charging permit fees as a means of profit:

> The license provides: "To implement this paragraph (b), the Licensee may, among other things, establish a program for *issuing permits* for the specified types of use and occupancy of project lands and waters, which may be *subject to the payment of a reasonable fee to cover the Licensee's costs of administering the permit program*." FERC reserved the right to require Union Electric to file its standards, guidelines, and procedures for implementing the land-use article, and FERC also retained the right to require modifications of these instruments.

*Id.* (emphasis added). Not only is UE prohibited from operating its permit program for the commercial purpose of generating profits, the details of UE's permit program are subject to ongoing review and modification by FERC to ensure they comply with the requirements in UE's license.

Read carefully, therefore, the terms of the FERC license that Anderson relies upon actually refute her arguments. UE's primary use of those portions of the Lake covered by private docks is not commercial. Instead, the FERC license terms show that UE bears the responsibility of protecting and enhancing the recreational value of the Lake, and UE issues dock permits only as a means of fulfilling that responsibility. Even though UE charges fees in connection with those permits, those fees are not indicative of a commercial purpose because UE is authorized only to charge fees to recover the cost of its permit program. Because UE did not use the private docks on the Lake (or the water in the vicinity of those docks) primarily for a commercial purpose, those portions of the Lake do not qualify as "noncovered land" for purposes of the exception in section

537.348(3)(d).[6]  Accordingly, UE is entitled to immunity under the RUA and the trial court properly dismissed Anderson's petition pursuant to section 537.346.

### *Conclusion*

For the reasons set forth above, the judgment of the trial court is affirmed.

_____
Paul C. Wilson, Judge

Russell, C.J., Breckenridge, Fischer and Stith, JJ., concur;
Teitelman, J., dissents in separate opinion filed;
Draper, J., concurs in opinion of Teitelman, J.

---

[6]  Because UE does not use the private docks on the Lake (or the waters in their vicinity) primarily for commercial purposes, the Court does not need to consider – and expresses no view about – whether these portions of the Lake are excluded from the definition of "noncovered land" by the proviso at the end of section 537.348(3)(d).

13



# SUPREME COURT OF MISSOURI
## en banc

ANGELA ANDERSON,          )
                                    )
                Appellant,     )
                                    )

v.                                 )        No. SC94372
                                    )

UNION ELECTRIC COMPANY,  )
                                    )
                Respondent.   )

### DISSENTING OPINION

I respectfully dissent from the principal opinion's holding that the dock fees charged by UE are not a "charge" for admission to the Lake of the Ozarks. The Recreational Use Act's immunity provisions should be strictly construed because the immunity provided by the Act is in derogation of common law. *See Overcast v. Billings Mutual Ins. Co.*, 11 S.W.3d 62, 69 (Mo. banc 2000).

In this case, the children were using the dock to enter the lake to engage in recreational activities. There is no dispute that UE required the dock owners to pay a fee for the dock's placement and use. Unlike the picnic shelter at issue in *Foster v. State*, 352 S.W.3d 357, 359 (Mo. banc 2011), relied upon by the principal opinion, the dock at issue in this case is not simply rented for temporary use. Instead, UE charges the dock owner a fee that grants private access to the owner and his or her guests. The plaintiffs alleged that the children used the dock, which existed by virtue of the fees paid, to enter

the lake and swim.  Under a strict construction of the Act and the given the facts of this case, I would hold that these dock fees amounted to a "charge" for the children to use the dock to access the lake.  I would reverse the trial court's judgment holding that UE was immune from suit pursuant to the Recreational Use Act.


_____

Richard B. Teitelman, Judge

2